BECK *v.* STATE EX REL. ATTORNEY GENERAL.

Opinion delivered March 4, 1929.

*A. B. Shafer* and *Lowell Taylor,* for appellant.

*Hal L. Norwood,* Attorney General, *H. W. Applegate, Lovick P. Miles, Henry J. Livingston, Guy Amsler,* and *Chas. D. Frierson,* for appellee.

SMITH, J.   Suit was filed by the Attorney General, on the relation of the State, against J. O. E. Beck and other riparian owners of lands adjacent to Horseshoe Lake, in Crittenden County, Arkansas, in which it was alleged that the defendant landowners had constructed a ditch from a bayou, referred to interchangeably as Jennings or Berlin Bayou, to Fish Bayou, which was carrying and would reduce the water of Horseshoe Lake to such a level that the navigation of the lake and its fishing and hunting value would be interfered with and greatly diminished.   Certain fishing and hunting clubs intervened, and enlarged upon these allegations, it being recited in their intervention that they had expended large sums of money in building club and other houses, boat docks, etc., to enable them and their guests to enjoy the sports of hunting and fishing upon the lake, and that this right would be greatly interfered with if the defendants were not required to dam their ditch, thereby stopping the flow of water out of the lake.

Answers were filed by the defendants, in which it was admitted that the lake was a navigable stream, and had great value to the public for hunting and fishing, but it was denied that it was proposed to destroy or diminish these values.   It was alleged that the defendant Beck had constructed a system of underground tile drains for his plantation, to drain the surface water from his land into the lake, which he had done and could do at the normal flood level of the lake, but it was alleged that, through the closing up of the outlet from the lake into the Mississippi River and other outlets from the lake into the St. Francis River, the normal flood level of the lake had been raised to the point where Beck's drainage system not only did not drain into the lake, but the water ran back the other way and made impossible the cultivation of a large quantity of Beck's land.   It was alleged

also that, by reason of the increased flood level, the outer banks of the lake—which are bluff—are caving, and it was alleged by the defendant Snowden that he had lost between twenty and thirty acres of valuable land, and that he had spent four thousand dollars driving piles in an unsuccessful attempt to save the front yard of his home, which opened out upon the lake.

Defendants denied that they had dug a ditch into Horseshoe Lake, but alleged the facts to be that Jennings and Fish Bayous were natural outlets of the lake, whereby excess water was carried into the St. Francis River through Fifteen-Mile Bayou, and that these bayous had been filled up by cutting the timber to clear the land, and by its cultivation, until they no longer served as natural drains, which they in fact were. Fish Bayou connects with the lake on the northeast side thereof, and then winds a tortuous course north of the lake to the northwest side thereof, where it connects with Jennings Bayou.

The length of Fish Bayou is twelve or fifteen miles, and it was alleged and shown that the cost of clearing it out from its mouth to its intersection with another bayou, called Caruthers Bayou, would be very great, whereas the same results could be achieved by digging a ditch connecting Fish Bayou with Jennings Bayou, which last named drain emptied into the lake on its eastern side. This is the ditch which the landowners dug, and this proceeding was brought to require them to dam it up. This ditch begins at a point in Jennings Bayou 1,800 feet from the lake, and runs 4,400 feet to the point where it empties into Fish Bayou. The answer alleged that, by digging this ditch, defendants have accomplished the same purpose that would have been accomplished had they opened up and cleared out Fish Bayou. Defendants alleged their intention to be only to restore the flood level of the lake to its normal stage.

A description of Horseshoe Lake will be found in the cases of *Barboro* v. *Boyle,* 119 Ark. 377, 178 S. W. 378, and *State ex rel. Thompson* v. *Parker,* 132 Ark. 316, 200 S. W. 1014.

It was said in the Parker case, *supra,* that the lake was so named because of its shape, and that the inner bank of the lake is low and sloping, while the outer bank is high and clearly defined. An area of about a thousand acres in the bend of the horseshoe, known as Happy Jack, was flooded when the St. Francis levee was built in 1905 across the outlet which connected the lake with the Mississippi River. This levee impounded the waters, as is stated in the opinions above mentioned and in that of *Parker* v. *Frierson,* 124 Ark. 238, 187 S. W. 162 also, and resulted in raising the level of the lake about five feet.

It was the opinion of the chancellor, as is indicated by the decree from which this appeal comes, that the State had acquired, under the decisions of this court in the cases above referred to, the prescriptive right to maintain the increased level of the water of the lake, and that the defendants were about to reduce the superficial area of the lake, and in doing this materially diminished the value of the lake to the public for hunting and fishing purposes. The court decreed that the defendants should permanently maintain a dam or obstruction across the mouth of the ditch, and that the dam or obstruction be maintained so as to prevent at all times escape or drainage of any of the waters of Horseshoe Lake through said ditch. This appeal is from that decree.

We have before us a large record, which we will not review, but will state only our conclusions concerning the testimony, after having carefully considered it.

The testimony on the part of the State and the intervening sportsmen is to the effect that the waters impounded by the St. Francis levee, upon its construction in 1905, overflowed Happy Jack, and that this and the adjoining similar area remained submerged until the summer of 1926, when, on account of decreased rainfall and the absence of any seepage from the Mississippi River into the lake, the water level was so lowered that Happy Jack and the adjacent areas reappeared as land, and shallow water over the Happy Jack area affords an ideal place for fish to spawn and for ducks to feed, but

if the water is taken off this area it becomes valueless for that purpose, and the value of the remainder or deep portion of the lake for hunting purposes is greatly diminished.

The testimony on the part of the landowners is to the effect that the ditch will not take off all the water from the Happy Jack area, but that, if it does, the hunting and fishing value of the lake will not be thereby diminished.

We think the testimony, in its entirety, establishes the fact that the ditch will not reduce the water level more than two or three feet lower than it would be without the ditch, unless the ditch was deepened by the flow of the water through it, but we think the testimony clearly shows this scouring out will not occur, because the ditch does not have enough fall to accomplish that result. For the first 2,100 feet the ditch is on a one-tenth of one per cent. grade; the next 1,500 feet is on a level grade, and for 300 feet is on a two-tenths per cent. grade, and from there to its entrance to Jennings Bayou is one-half of one-tenth per cent. grade, and the testimony of the engineers is to the effect that a ditch of this grade will not deepen.

H. N. Pharr, the chief engineer of the St. Francis Levee District, whose professional life has been spent in connection with that district, testified that, in the absence of seepage from the river into the lake, and local rainfall, the ditch would lower the water in the lake at the rate of one inch a day until the water ceased to flow through it. This being true, we think the plaintiffs are sustained in their contention that the ditch would reduce the water level to a point from which the evaporation always occurring and to be expected would further reduce the water level so that the Happy Jack area might, at some time during the year, reappear as land, and, if this were done, the value of the lake for hunting and fishing purposes would be diminished.

But it does not follow, because this is true, that the defendants have no right to dig the ditch. It must be remembered that we are considering the right to dispose

of flood waters, which the testimony clearly shows has greatly damaged riparian owners. The testimony on the part of the defendant Beck is to the effect that his plantation of 8,000 acres, under which he has 600,000 feet of tile drainage, would normally and naturally drain into the lake, and his drainage system is planned to do this, but the high flood level prevents it. Snowden, another landowner, testified that he had lost between twenty and thirty acres of his farm, and had lost the front yard of his residence twice, and the caving banks caused by wave wash were still encroaching on him, that he had already spent four thousand dollars and would have to spend that much more to protect his home, and that, if the caving of the banks was not stopped, he would lose thirty acres more of his cleared land and about ten farm houses, if they were not removed. Other landowners suffered in like manner, but in less degree. It appears to be the opinion of all the landowners that some disposition of this flood water is necessary for the protection of their property.

This flood water is impounded, as appears from the opinions in the cases above cited, by the St. Francis levee, and the defendants seek to restore the condition which would exist without the levee, but we think the undisputed testimony shows that the ditch will not quite do this. In other words, after the water has ceased to flow through the ditch, the level then existing will be higher than it would be but for the presence of the St. Francis levee.

It was said in the case of *McCoy* v. *Board of Directors of Plum Bayou Levee District,* 95 Ark. 345, 129 S. W. 1097, 29 L. R. A. (N. S.) 396, (to quote a syllabus in that case), that: "The flood waters of a river are a common enemy which any landowner may defend against without incurring liability for damages, unless injury is unnecessarily inflicted upon another which, by reasonable effort and expense, could be avoided."

It is this common enemy from whose encroachments the riparian owners seek to protect their property.

It is insisted that the case of *State ex rel.* v. *Parker, supra,* is decisive of this case, and forbids the landowners from now reducing the superficial area of the lake. In that case the court said, in speaking of Happy Jack as a part of Horseshoe Lake:

"When the waters of natural navigable lakes in this State are extended by artificial means so as to cause the land of riparian owners to be flooded, without their consent, and this condition is not merely temporary, but is continued for a sufficient length of time for the standing waters to produce a distinctive new highwater mark for the waters of the lake bed, this gives the State, as the owner of such lake bed, the possession of the lands so covered to the high-water mark. Such possession is open, for a complete submergence of one's land in this manner could not escape observation, and, if the owner is powerless to remove the cause and to restore the lands to their former condition, such possession is also adverse, and, if it continues for seven years or more without interruption, the State acquires the title to the lands so submerged; for, in such case, they have become a part of the natural lake bed. Such is the case here, and, as already observed, the State has acquired title by prescription or limitation. (Citing authorities)."

We do not impair the doctrine of that case, but we do interpret it in the light of the facts to which it applied. There the trustees of a sporting club which owned the Happy Jack area sought, while the same was a part of the lake, to so inclose it as to exclude the public therefrom. We held this could not be done, because the submergence of the land for a period of more than seven years made the Happy Jack area by prescription a part of the lake, but we so held because it appeared, under the facts of that record, that the increased flood level, which was said to be five feet, "cannot be removed therefrom in any legitimate way." Here the testimony shows the landowners can obtain relief in a legitimate way, that way being to open by natural drains, which,

when restored to the original state, will partly reduce the flood level.

Section 3663, C. & M. Digest, reads as follows:

"Any person, persons, levee or drainage district interested in the maintenance of the free flow of water through any stream, drain, ditch, or canal, may, where there is any timber, trees or material in any such stream, ditch, drain or canal, which tends to obstruct the free flow of water, remove the same, and shall have a cause of action against any person, persons or corporation who may have felled or thrown, or caused to be felled or thrown, such timber, trees or materials into such stream, drain, ditch or canal, for the reasonable cost of removing the same, whether the said obstruction was placed in said stream, ditch, drain or canal either before or after the passage of this act."

This statute gives the right to remove obstructions from any stream, ditch, drain or canal which obstruct the flow of water, and it is a continuing right which may be exercised at any time, "whether the said obstruction was placed in said stream, ditch, drain or canal either before or after the passage of this act."

We think the defendants are in effect exercising the statutory right. It is true they did not clear Fish Bayou of obstructions as they might have done, but this is the effect of what they did. We think the undisputed testimony shows that the ditch will not carry away as much water as Fish Bayou would have carried away had it been restored to its natural state, for, be it remembered, the ditch emptied into Fish Bayou, which, without any work on its channel from there to its mouth, carries the water which flows into it from the ditch, and would carry more if the ditch were deeper.

It is argued that the St. Francis levee closed the only outlet the lake had, and the opinion in the case of *State* v. *Parker, supra,* recites the fact so to be. But we think an undisputed fact shows the contrary to be true. This undisputed fact is that the ditch does not enter the lake, but begins 1,800 feet from it. The water can get

into the ditch only by flowing out of the lake into Jennings Bayou. It must therefore be true that the bayou is an outlet, and it is also true that water flows through the bayou into the lake without removing any obstructions in that bayou, as § 3663, C. & M. Digest, provides may be done.

We are not therefore concluded by the opinion in the *State* v. *Parker* case *supra,* because the facts in the instant case are different. *Simpson* v. *Martin,* 174 Ark. 956, 298 S. W. 861.

The defendants are not barred by the seven-year statute of limitations as were the landowners under the facts stated in the *State* v. *Parker* case, *supra,* as these defendants can obtain relief by exercising the continuing right given them by § 3663, C. & M. Digest.

We conclude therefore that the court was in error in requiring defendants to dam up their ditch, and the decree will be reversed, and the cause remanded with directions to so modify the decree as to permit defendants to reopen their ditch, provided that in no event shall they be permitted to lower the water level below the point it would reach if the St. Francis levee were removed.

Wood, Kirby and Mehaffy, JJ., dissenting.