LEADER *v.* MATHEWS.

4-4362

Opinion delivered July 6, 1936.

*E. G. Ward,* for appellants.

*Arthur Sneed,* for appellees.

BAKER, J. The appellants sued the appellees in the chancery court praying for a mandatory injunction to require appellees to remove a certain dam or levee

erected along the dividing line between the properties belonging to appellants on the north side of said dam, or levee, and appellees on the south side thereof. It is alleged in the complaint that Raft Slough is a watercourse flowing in a southwesterly direction, across property belonging to the plaintiffs thence south upon and across property belonging to the defendants, and that the defendants by the construction of a levee or dam upon their own land, but just south of the line dividing the two properties, has impounded water so as to overflow forty or fifty acres of land belonging to the appellants, damaged crops that were growing thereon, and that the defendants wrongfully maintained the said levee, which is about 400 feet long, about 6 feet thick at the bottom, 2 feet thick at the top, and 3 or 4 feet high. There is no serious controversy between the parties relative to the law in this case, but there is a conflict as to the questions of fact, as well as the application of principles of law applicable to these facts when they are determined. The appellants here were the plaintiffs below and they insist that the body of water across which the dam has been built is a watercourse as defined by this court in the case of *Boone* v. *Wilson*, 125 Ark. 364, 368, 188 S. W. 1160.

The court there said: "A watercourse is defined to be a running stream of water; a natural stream, including rivers, creeks, runs and rivulets. There must be a stream, usually flowing in a particular direction, though it need not flow continuously. It may sometimes be dry. It must flow in a definite channel, having a bed and banks, and usually discharges itself into some other stream or body of water. It must be something more than mere surface drainage over the entire face of the tract of land occasioned by unusual freshets or extraordinary causes."

Several witnesses testified, and their descriptions of the conditions that prevail are such that it might well be determined from what they have said that the dam is across a watercourse. It is, also, true that the appellees have offered a considerable amount of testimony to the effect that at the location of the dam there is a swale, or slash, or slough, or depression, which was probably at one time, but not within the memory of witnesses testi-

fying, the channel or course of a stream. Some of appellants' witnesses say that the beginning of this slough is at a point on the river where it breaks over during high water, and they trace its course for a distance of six or seven miles where it flows into a channel known as Old River.

In an effort to consider all the facts in this case, we think the following statements, if not undisputed, are sustained by a great preponderance of the testimony.

On appellant's lands there is a long hole, or reservoir, perhaps two or three hundred feet long and several feet deep. The appellants had cut some ditches, drained water into this reservoir, or depression. A part of this same depression, or low ground, extends south on the Caldwell lands, and still further south upon these lands is another hole, or reservoir, or long pool, similar to that on lands of appellants. East of the lands belonging to these parties is drainage ditch No. 9, which crosses the so-called Raft Slough at a point north or northeast of all of their lands. Appellants have attempted, with one or two ditches, to drain water from this hole or depression on the Leader lands into drainage ditch No. 9. The distance is about 900 feet, and in that distance there is a fall of little more than two feet. This ditch, however, does not always operate to drain the water from the lands into the ditch, because of the fact that when water accumulates in the ditch to a depth of three or four feet it flows back or west upon appellants' lands. No flood-gates have been put in to prevent this back-flow. On account, however, of this trouble the appellants at one time put in some pipes, flues from an old boiler, and then dammed above these, which permits a slow flow of water in whatever direction conditions may determine. Appellants insist that if the dam put up by appellees were cut or taken out the water would flow on south across the lands of appellees and leave their lands, as well as appellees' lands, comparatively dry, except in the bed of the watercourse.

While these facts were denied by witnesses of appellees who are equally positive, there are certain physical facts which should be taken into consideration. Witnesses who testified for appellants say that about a year

ago they measured the water immediately north of the dam and it was there found to be about twenty-six inches deep; that immediately south of the dam the water was four or five inches deep.

No explanation is made why this water south of the dam did not flow on further south according to their contention. All of the witnesses testify that north of Leader's land is a roadway across this draw, slash, depression, or swale. Some of the witnesses say that Leader helped to fill up this roadway by hauling in dirt and sand and making the dam or embankment there for the road. But there is no water impounded by this road so built up, although there is no culvert or other passageway permitting the water to flow across the roadway. Whatever water accumulates at that place must necessarily pass off by the road ditches.

Appellants offered as their witness a Mr. Laffier, who took levels of lands affected by this so-called overflow condition. His levels show that immediately south of this levee, or dam, the lowest lands on this depression are slightly higher than the lowest lands in the depression north of the dam, and according to these levels as taken the dam was built across the south end of the depression; and, while there are some low lands still south of the dam, the larger part of the low lands are north of it. This fact, perhaps, accounts for the water remaining five or six inches deep south of the ditch and being twenty-six inches deep north of the ditch at the time the measurements were taken.

Of course, if the dam were not there, the water north of the dam would seek its level and flow to the south filling the depression and some of it flow away; but, according to the measurements shown, much of the water would have to remain upon the land until it was absorbed or taken up by evaporation. High water would, of course, force large quantities of it on to the south under the same conditions that prevail when water flows from drainage ditch No. 9 on the east side west into Raft Slough. The so-called swale, or depression, if the dam were removed, would, no doubt, to some extent, lower the water north of the dam. But if these measurements are

correct, Raft Slough would not operate as a drainage canal for either appellants' or appellees' lands unless some channel or ditch be cut upon appellees' lands for the flow of the water.. A part of the so-called bed is in cultivation.

There is testimony to the effect that at the south end of the Caldwell lands some ditches have been cut to drain out some of these low places.

We have set out these physical facts somewhat in detail as they were presented to the court, for the reason that it must be apparent, with these facts stated, that this Raft Slough is more in the nature of a reservoir, or depression, than a watercourse.

Appellants are responsible for proof to the effect that flood waters are drawn away by this depression or slough. These flood waters flowing into the low places and filling them to overflowing do not necessarily constitute watercourses, and a land owner is justified in defending against such flood waters and can do so without incurring liability, unless he unnecessarily injures or damages another. *McCoy* v. *Board Directors of Plum Bayou Levee Dist.,* 95 Ark. 345, 129 S. W. 1097; *Beck* v. *State, ex rel. Attorney General,* 179 Ark. 102, 14 S. W. (2d) 1101.

We have already stated that the removal of the dam would perhaps lower the water level on land of appellants, but would not operate to drain the land unless a ditch be cut on the land of Caldwell and others to the south. Some of the water would still remain on the lands of appellants. More land, however, of appellees would be covered by removal of dam, unless there were a ditch cut to carry water away. Caldwell is under no obligation to cut or open any ditch upon his land to afford that drainage. *Missouri Pac. Rd. Co.* v. *Parker,* 167 Ark. 42, 266 S. W. 959; *Ayer-Lord Tie Co.* v. *Puckett,* 169 Ark. 271, 273 S. W. 715.

The waters causing the most serious trouble in this case are overflow waters when waters are high, or they are surface waters at other times, and against either one of these a land owner has the right to defend himself as against a common enemy, without rendering himself lia-

ble for damages, unless he unnecessarily injures or damages another for his own protection. *Baker* v. *Allen*, 66 Ark. 271, 50 S. W. 511.

"A watercourse consists of bed, banks and water; yet the water need not flow continually; and there are many watercourses which are sometimes dry. There is, however, a distinction to be taken in law between a regular flowing stream of water, which at certain seasons is dried up, and those occasional bursts of water, which, in times of freshet, or melting of ice and snow, descend from hills and inundate the country." Section 4, Angel on Watercourses, p. 2.

The chancellor was most probably correct in holding there was no water course obstructed by the dam.

Another well-considered case, which was first decided in the same court as the instant case, we think is conclusive of the rights of the parties here. The case is *Jackson* v. *Keller*, 95 Ark. 242, 129 S. W. 296. In that case Jackson had cut a ditch about 60 rods long between his two forties. The ditch was about four feet wide at the top and two feet deep, ran due south from the point of beginning on appellant's land to the dividing line between land of appellant and appellee, thence east to the point of high land. He said in his testimony that the object in cutting this ditch was to concentrate the water of these ponds to the old ditch west of Keller's land. About twenty rods of this ditch was cut through land that did not overflow except in very high water. That twenty rods was intended to catch the water before it got into these ponds. The appellee in that case constructed a dam or levee upon his land to protect it from the water concentrated and accumulated by the appellants' ditches. This court said in that case: "The chancellor evidently found that appellant was at fault in digging ditches that turned the water on to appellee's land in greater volume than it would have gone had it been permitted to run in its natural course along and into the swale that existed where the waters passed from appellant's land on to the land of appellee. Appellant, while protecting himself from the surface water that accumulated on his land, had no right to con-

centrate and throw it by ditches with greater force and volume than it otherwise would have gone upon appellee's land, so as to unnecessarily damage him. See *St. L., I. M. & S. R. Co.* v. *Magness*, 93 Ark. 46, 123 S. W. 786. Appellee had the right to erect an embankment to protect his land against such increased flow upon it. In the draining of one's land of surface water it is not permissible to direct the flow of the water upon the adjoining land, or to increase the volume of the flow by the construction of a drain or ditch. Tiedeman on Real Property, § 615, p. 587. The doctrine of *Baker* v. *Allen*, 66 Ark. 275, 50 S. W. 511, when applied to the facts of this case, shows that the decree was correct.''

The same conditions prevail in this case as in the case of *Jackson* v. *Keller, supra.*

The chancellor's decision is supported by the preponderance of the testimony; if not, the evidence presented is in such sharp conflict that the chancellor's finding will be deemed to be correct.

The decree is, therefore, affirmed.