STACY *v.* WALKER.

5-245 262 S. W. 2d 889

Opinion delivered December 21, 1953.

820

*Rhine & Rhine,* for appellant.

*Bryan J. McCallen,* for appellee.

GRIFFIN SMITH, Chief Justice. Stacy owns 48 acres south of and adjoining Walker's 32 acres. An old fence-row delineates the dividing line. Along this fencerow for a distance of 190 feet Stacy constructed an earthen levee varying in height from 18 inches to less than three feet. Eight acres of Walker's land drains north into an old river run. The remaining 24 incline southeast with the result that Stacy's farm, prior to erection of the levee, caught discharge waters that eroded productive land.

With construction of the levee several acres of Walker's land were adversely affected. Following heavy rains water accumulated against Stacy's dam and gradually spread over an area regarded by Walker as his best cotton land. He sued for damages to the 1951 cotton crop amounting to $1,600 and for a mandatory order directing Stacy to breach the levee. From a $50 judgment for nominal damages and a decree for elimination of the levee Stacy has appealed.

Two questions are presented: (1) Was the flowage area on Stacy's land a defined waterway in respect of which Walker had acquired the right of usage? (2) If the water Stacy diverted was the accumulation of periodic rainfall and the flowage was such that the affected proprietor was justified in fending against it, did he unnecessarily injure Walker by construction of the levee? It is urged that an inexpensive ditch would have accomplished the same end. A so-called "bonded drainage ditch" is within close proximity to the affected lands.

In his relief prayer Walker asked the court ". . . to declare and establish that the defendant's land is ser-

vient to plaintiff's land with respect to the right of plaintiff to enjoy the natural and unobstructed drainage of [his] land over and across the land of defendant''.

Walker was asked whether there was a well defined ditch that the water followed in crossing Stacy's land. He mentioned a natural outlet that existed prior to the obstruction complained of, explaining that the water from this natural outlet flowed south and a little east across Stacy's land, then went into the improvement district ditch. Responding to an inquiry if the flowage followed a natural channel or ditch upon entering his neighbor's property Walker replied. ''It has a natural [land] contour to follow, with a small amount of washing out.'' And again: ''There was a well defined ditch. It is the natural contour of the land that extends from my field approximately half way to the ditch.''

On cross-examination Walker said that there was no ''leadway or channel or 'planted levee' '' on his property. The water that caused trouble came from rains:— ''There is no stream coming in on my farm: it was absolutely the water that falls.'' There was no creek or depression ''with banks'' that carried the water across his own farm—''Nothing but the plowed-up levee between my farm and Mr. Stacy's. It leads the water all the way across the south side to the natural runway. It is blocked now by the levee.'' Nothing that Walker would term a runway is on his farm, and the water ''has a more or less natural tendency to run south and east''.

W. M. Brawner, an engineer in the government service, testified from experiences covering twelve years in drainage and flood control activities. With the aid of a surveyor he had made measurements on the Stacy and Walker lands and was familiar with the drainage problem. He observed a ''scour'' starting at an indicated point in the fencerow. Water would flow eastward from Walker's land. The scour indicated on Stacy's property was caused by this flowage. It started from a low point in the fencerow and had the effect of localizing surface water, thus causing greater erosion than would have been

the case if the water had spread over a larger area. Brawner examined Walker's land north of the Stacy levee as far as the old river run.

It was Brawner's opinion that a small drainage ditch —costing not in excess of $80—could be run from the southeast corner of Walker's land north "to this old slough". Such an undertaking, he thought, would afford complete relief from the difficulties complained of. But the witness did not believe that the amount of water impounded by the levee was sufficient to justify the expenditure. The question was asked regarding probable effect of removing the levee and Brawner replied: "We do know that [the land] will erode, because it already has, and it will continue to do so. [The result] would be equally detrimental to Walker and Stacy because scour would continue in a direction from which the water comes, and naturally Stacy's land will [deteriorate]. The more Stacy's land scours the more Walker's property will scour".

It was also Brawner's opinion that Stacy had no drainage problem "except that of protecting his property against surface water".

We think the record clearly shows that rain falling on Walker's land did not spread with uniformity, but followed slight surface depressions until it finally accumulated at points along the levee site to empty onto Stacy's property following a contour that in no sense could be regarded as a natural flowage way. This resulted in the "scouring" process spoken of by Brawner. It also created a bog with no outlet. Since it is conceded that there was no constant stream or natural watercourse other than these slight depressions, it follows that Stacy had a right to defend himself.

Under the rule announced in *Leader* v. *Mathews*, 192 Ark. 1049, 95 S. W. 2d 1138, water flowing into low places does not necessarily constitute a natural course, and where overflow occurs ". . . a landowner is justified in defending against such flood waters and can do so without incurring liability, unless he unnecessarily in-

jures or damages another." See *Brasko* v. *Prislovsky*, 207 Ark. 1034, 183 S. W. 2d 925. Judge EAKIN's opinion in *Little Rock & Ft. Smith Ry. Co.* v. *Chapman*, 39 Ark. 463, 43 Am. Rep. 280, was cited because of the comprehensive statement regarding one's right to protect his property where that result can be achieved without disproportionate prejudice to another. In *Dent* v. *Alexander*, 218 Ark. 277, 235 S. W. 2d 953, we quoted with approval from *Bohn* v. *Salt Lake City*, 79 Utah 121, 8 Pac. 2d 591, 81 A. L. R. 215, to the effect that a landowner is under no duty to receive upon his land surface water from the adjacent property. On the contrary, in the use or improvement of his land, he may repel such water at his boundary. This statement is, of course, subject to the modification that unnecessary harm must not be inflicted.

In the case at bar Stacy testified that construction of the levee—built with his own equipment and labor—cost about eight dollars. The estimate made by Brawner that for $80 Walker could drain his own land without injury to Stacy was predicated upon the employment of outside labor.

We think the evidence preponderates in Stacy's favor respecting each essential issue, hence the decree must be reversed with directions to dismiss the complaint.