ARKANSAS RIVER RIGHTS COMMITTEE *v.*
ECHUBBY LAKE HUNTING CLUB

CA 03-389 126 S.W.3d 738

Court of Appeals of Arkansas
Division III
Opinion delivered October 29, 2003

[Petition for rehearing denied December 3, 2003.]

*John F. Gibson, Jr.*, for appellant.

*Bridges, Young, Matthews & Drake, PLC*, by: *Joseph A. Strode.* for appellee.

JOHN F. STROUD, JR., Chief Judge. This case involves the public's right of access to the following water-covered areas off the west bank of the Arkansas River in Desha and Lincoln Counties: 1) a narrow passage of water called the Echubby Chute, which may be entered from the Arkansas River; 2) a body of water located west of the Chute, called the Echubby Lake; 3) a ditch that connects the Chute and the lake; and 4) another small lake situated farther south in the Coal Pile area (collectively, "the Echubby areas"). Appellant, Arkansas River Rights Committee, a nonprofit group of hunters and fishermen, contends that, despite appellee's record ownership of the Echubby areas, the public has a right to access them because they are navigable and because they have been used by the public for more than seven years, such that a prescriptive right of use has been acquired. The trial court entered summary judgment, quieting title and right of possession to the Echubby areas in appellee. Appellant appeals on the ground that fact questions remain to be decided. Appellee cross-appeals from the trial court's enlargement of time for appellant to respond to the motion for summary judgment. We reverse and remand on direct appeal and affirm on cross-appeal.

Although the Echubby areas are now covered by water, that has not always been the case. In the 1960s, the Corps of Engineers constructed Lock and Dam No. 2 on the Arkansas River in southeast Arkansas as part of the McClellan-Kerr Navigation project. The project, using a system of locks and dams, rendered the Arkansas River navigable between Tulsa, Oklahoma, and the Mississippi River. Lock and Dam No. 2 was completed in 1968 · and, as a result, the river level rose in the area. This caused the

Echubby Chute and the connecting ditch to become filled with water, thus making the Echubby areas accessible from the river where they had not been before.

Appellee purchased the Echubby areas from the Chicago Mill & Lumber Company on April 6, 2001, as part of a 2,400-acre land acquisition. Thereafter, appellee applied to the Corps of Engineers for permission to construct the crossings over the Echubby Chute. Appellant opposed the application, contending that the crossings would block public access to the Echubby areas. As the result of the crossing dispute and appellant's insistence that the public had a right to access the Echubby areas for fishing and hunting, appellee filed a complaint in Lincoln County Circuit Court on June 17, 2002, seeking a declaration that it owned the Echubby areas free and clear of any right of access claimed by appellant. Appellant responded that the Echubby areas were navigable and that the public had exercised open and notorious use of the waters for a period greater than seven years, thereby creating a public prescriptive easement over the waters.

On August 8, 2002, appellee filed a motion for summary judgment, arguing that hunting and fishing rights cannot be acquired by prescription and that appellant's claim of navigability must fail because there was no evidence that the Echubby areas were navigable in their natural state, prior to the dam being completed in 1968. Attached to appellee's motion were the affidavits of Gene Wesser, Robert Stephens, and Richard Metcalf. Wesser stated that he had been familiar with the areas since 1961 or 1962 and that the areas were above the ordinary high-water mark[1] of the river prior to construction of the lock and dam. He further said that the property was dry ground and not accessible by boat until the lock and dam were built. Stephens said he had been familiar with the area since 1951 and that the areas in question were dry land prior to the construction of the lock and dam. He

---

[1] The high-water mark of a navigable stream is the line delimiting its bed from its banks and is to be found by ascertaining where the presence and action of the water are so usual and long-continued in ordinary years as to mark upon the soil of the bed a character distinct from that of the banks in respect to vegetation and the nature of the soil. *St. Louis Iron Mtn. & S. Ry. Co. v. Ramsey*, 53 Ark. 314, 13 S.W. 931 (1890). This term is relevant because, if water is navigable, members of the public have the right to use the water at any point below the high-water mark. *See Hayes v. State, infra.*

stated that, prior to that time, all of the property was above the ordinary high-water mark and was not navigable by boat.

Metcalf, one of the owners of the appellee hunting club, attached maps from 1950 and 1959 to his affidavit. The maps showed that, although the Echubby Lake and the lake in the Coal Pile area existed at that time, there was no evidence of a chute or ditch connecting these lakes to the Arkansas River. The same was shown by two aerial photographs from the early 1960s.

Appellant responded that fact questions remained to be decided, and it attached the affidavit of David Selvey to its response. Selvey stated that the Arkansas River Navigation System had been completed over thirty years previously and that the water level of the river covered the areas in question throughout the year. He also stated that he and others had boated into the Echubby Lake and the Coal Pile area over the past seven years without being required to get permission from anyone.

Following a hearing, the trial court granted appellee's motion for summary judgment. Appellant argues that summary judgment was improper because fact questions remain as to the navigability of the Echubby areas and the public's prescriptive use of them. We agree with appellant's contention.

We have ceased referring to summary judgment as a "drastic" remedy. We now regard it simply as one of the tools in a trial court's efficiency arsenal; however, we approve the granting of the motion only when the state of the evidence as portrayed by the pleadings, affidavits, discovery responses, and admissions on file is such that the nonmoving party is not entitled to a day in court, i.e., when there is no genuine remaining issue of material fact and the moving party is entitled to judgment as a matter of law. See Parkerson v. Lincoln, 347 Ark. 29, 61 S.W.3d 146 (2001). The burden of proving that there is no genuine issue of material fact is upon the movant, and all proof submitted must be viewed favorably to the party resisting the motion. Id. On appellate review, we determine if summary judgment was proper based on whether the evidence presented by the movant left a material question of fact unanswered. Id.

## Prescriptive Use

■ Although incursions on the land of another for the purpose of hunting and fishing do not signify an intention to appropriate lands for one's own use, *State ex rel. Thompson v. Parker*, 132 Ark. 316, 200 S.W. 1014 (1917), the State's inundation of another's lands may, in some circumstances, put the State in possession of those lands and thus allow access by the public. *Id.* Appellant relies on *Thompson v. Parker* to support its argument that a fact question remains as to whether the pubic acquired a prescriptive right to use the Echubby areas.

■ Thompson involved certain areas of Horseshoe Lake, a large body of water in Crittenden County. The lake, as its name suggests, is shaped like a horseshoe with a large peninsula of land in its center. A hunting club owned property on this peninsula. In 1905, the St. Francis Levee District built a levee across an outlet of the lake and, as a result, the lake's waters rose and covered approximately 1,000 acres of the club's land. The club contended that it still owned that water-covered land and tried to exclude the public's access. The supreme court recognized that, although the newly-covered land was not part of the lake bed prior to the levee being built, when the levee was built and the land was inundated by water, a new situation was created:

> When the waters of natural navigable lakes in this State are *extended by artificial means so as to cause the land of riparian owners to be flooded, without their consent,* and this condition is not merely temporary but is *continued for a sufficient length of time for the standing waters to produce a distinctive new high-water mark* for the waters of the lake bed, *this gives the State, as the owner of such lake bed, the possession of the lands so covered by the high-water mark....The State has acquired title by prescription* or limitation....The inundation of [the club's] lands, under the circumstances, put the State in possession and as effectually foreclosed any private ownership and dominion in the [club]....

132 Ark. at 321-23, 200 S.W. at 1016 (emphasis added). The court held that, after the levee was constructed and water from a navigable body inundated the riparian owner's land without the owners's consent for a sufficient length of time, the public acquired the right to use the lands so covered.

The facts in *Thompson* bear a similarity to the facts in the case at bar. Here, after the lock and dam were constructed in 1968,

water rose and covered previously dry land, creating a connection to and access from the Arkansas River. Under the holding in *Thompson*, if the encroachment of river water into the Echubby areas was for a sufficient length of time to produce a new high-water mark and was without the landowner's consent, the public may have acquired a prescriptive right of usage of the areas.

■ Appellee argues that *Thompson* is inapplicable here because the landowners in the affected areas consented to the river's inundation of their property. We do not agree that such consent was established as a matter of law. Appellee contends that evidence of consent was shown by the "numerous public meetings about the project all up and down the Arkansas River Basin" regarding construction of the lock and dam. However, there is no evidence of those meetings in the record or of what may have been agreed to or discussed at them. We do not consider matters outside the record to determine issues on appeal. *See Boswell, Tucker, & Brewster v. Shirron*, 324 Ark. 276, 921 S.W.2d 580 (1996). Appellee also points to the fact that, while the lock and dam was being constructed, the government obtained flowage easements from riparian owners along the river. Although some documents in the record show that Chicago Mill sold flowage easements to the federal government on various tracts of its property in the year 2000, the documents do not clearly establish that the easements correspond with the land that Chicago Mill sold to appellee. Further, the record does not show that Chicago Mill granted any flowage easements to the government prior to 2000, at which point the flowage had already been in existence for over thirty years. On this last point, appellee claims that the government obtained easements on this property in 1964. However, once again, the record contains no evidence of this.[2]

---

[2] Appellee refers to a case, *United States v. 1068.51 Acres of Land*, No. PB-64-C-2, in which the government allegedly obtained an easement over the subject property in a condemnation action. Appellee has not provided us with any pleadings or orders from that case, and we have not located it in any published form. Therefore, we decline to rely on it to support appellee's argument. The record does contain a Certificate of Disclaimer filed by the government in a 1968 federal court case, No. PB-67-C-44. That Certificate states that in 1967, the government "acquired a perpetual easement and right to occasionally inundate the land lying below 167 feet m.s.l., in connection with the operation and maintenance of Lock and Dam No. 2, Arkansas River Project, said land being designated as Tract No. 1305E...." There is no evidence that Tract 1305E corresponds to any land now owned by appellee.

■ Appellee argues further that the holding in *Thompson* was diluted by the later case of *Beck v. State*, 179 Ark. 102, 14 S.W.2d 1101 (1929). *Beck* involved the same area of Horseshoe Lake as *Thompson*. Several years after the *Thompson* decision, Beck, who owned an 8,000-acre plantation on the peninsula, constructed a system to drain water from the surface of his land. However, due to timber cutting in the area, the flood level of the lake was so high that his system would not work; in fact, it backed up water onto his land. As a result, Beck dug a ditch about 1,800 feet up a bayou that drained off the lake in an attempt to create an outlet. He claimed that his intention was only to restore the flood level of the lake to its normal stage. The ditch had the effect of lowering the water level over some of the lands that *Thompson* had held were acquired prescriptively by the State. The State sued Beck, and the trial judge held, as per *Thompson*, that the State had acquired a prescriptive right to maintain the increased level of the lake. The supreme court reversed, and appellee in the case at bar claims that the reversal "discredited" the findings in *Thompson*. We disagree. The supreme court stated in *Beck* that "we do not impair the doctrine of" *Thompson*, 179 Ark. at 108, 14 S.W.2d at 1104, and took pains to note that Beck's ditch would not reduce the water level more than two or three feet. The court further emphasized that Beck was attempting to dispose of flood waters from his land and to clear obstructions from a stream, which he had a statutory right to do. The court also concluded that the water of the lake would still be higher than it would have been without the levee. We believe that *Thompson* remains valid and that, in light of its holding, a fact question remains as to whether the public has acquired a prescriptive right to use the Echubby areas.

*Navigability*

■■ Determining the navigability of a stream is essentially a matter of deciding if it is public or private property. *State v. McIlroy*, 268 Ark. 227, 595 S.W.2d 659 (1980), *cert. denied*, 449 U.S. 843 (1980). If a body of water is navigable, it is considered to be held by the State in trust for the public. *See Hayes v. State*, 254 Ark. 680, 496 S.W.2d 372 (1973); 9 *Powell on Real Property* § 65.11[2][a] (2003). Navigability is a question of fact. *Goforth v. Wilson*, 208 Ark. 35, 184 S.W.2d 814 (1945).

■■ Arkansas law has defined navigability as follows:

> The true criterion is the dictate of sound business common sense, and depends on the usefulness of the stream to the population of its banks, as a means of carrying off the products of their fields and forests, or bringing to them articles of merchandise. If, in its natural state, without artificial improvements, it may be prudently relied upon and used for that purpose at some seasons of the year, recurring with tolerable regularity, then in the American sense, it is navigable....

*McIlroy*, 268 Ark. at 234-35, 595 S.W.2d at 663 (quoting *Lutesville Sand & Gravel Co. v. McLaughlin*, 181 Ark. 574, 26 S.W.2d 892 (1930)). In 1980, this definition was expanded by the supreme court to include consideration of the water's recreational use as well as its commercial use in determining navigability. *McIlroy, supra.* In *McIlroy*, the court was asked to determine whether a stream that had considerable recreational value for boating and fishing was navigable, even though it lacked the commercial adaptability that was the hallmark of traditional navigability. The case involved the Mulberry River, described in the opinion as an intermediate stream at least 100 feet wide at some points, that for fifty to fifty-five miles of its length could be and often was floated by canoes or flat-bottomed boats. The Mulberry was designated by the state Department of Parks and Tourism as Arkansas's finest whitewater float stream. In 1838, it was "meandered" by surveyors, which is prima facie evidence of navigability. Based on these facts, the supreme court held that "there is no doubt that the segment of the Mulberry River that is involved in this lawsuit can be used for a substantial portion of the year for recreational purposes. Consequently, we hold that it is navigable...." *McIlroy, 268 Ark.* at 237, 595 S.W.2d at 665.

Under *McIlroy*, it is apparent that navigability may be established by recreational usefulness as well as commercial usefulness. In the present case, the Selvey affidavit filed by appellant shows that the Echubby areas have at least some recreational usefulness. Selvey stated that, in the past seven years, he and other fishermen have boated over the entire surface of Pool 2, which includes the Echubby areas, and further that water covers the areas year round. Admittedly, there is nothing in the record at this point to show that the level of recreational use in the Echubby areas compares with the extensive use of the Mulberry River in *McIlroy*, and obviously, the occasional foray by a fisherman into an area does not render it navigable; if that were so, every creek and pond in the

state would be navigable. However, we believe that the Selvey affidavit is sufficient to create a fact question as to the Echubby areas' navigability. Therefore, summary judgment was improper on this issue.

■ Appellee contends that the areas' present-day navigability is not relevant; rather, navigability must solely be determined as of the date of Arkansas's statehood because each state, upon entry into the union, took title to the navigable waters within its borders. *See generally Utah v. United States*, 403 U.S. 9 (1971); *Anderson v. Reames*, 204 Ark. 216, 161 S.W.2d 957 (1942). We disagree that the concept of navigability for the purpose of determining the public's right to use water is that static. Although navigability to fix ownership of a river bed or riparian rights is determined as of the date of the state's entry into the union, navigability for other purposes may arise later. *See, e.g., United States v. Appalachian Power Co.*, 311 U.S. 377, 408 (1940); *Hitchings v. Del Rio Woods Recreation & Park Dist.*, 55 Cal. App. 3d 560, 568, 127 Cal. Rptr. 830, 835 (1976) ("navigability for purposes of a public navigational easement need not be evaluated as of the date of statehood; it may later arise"); *Bohn v. Albertson*, 107 Cal. App. 2d 738, 743, 238 P.2d 128, 132 (1951) ("if the evidence showed the creation of a new channel of the river, the fact that there was no such channel [at statehood] would not prevent the assertion by proper public authority of the right to use that channel for navigation and fishing"); 65 C.J.S. *Navigable Waters* § 12 at 68 (2000). This point can·be illustrated by the fact that, in the following cases, the Arkansas Supreme Court did not address navigability for the purpose of public usage in terms of whether the water was navigable at the time of statehood but whether the water was currently navigable. *See State v. McIlroy, supra; Hayes v. State, supra; Five Lakes Outing Club, Inc. v. Horseshoe Lake Protective Ass'n*, 226 Ark. 136, 288 S.W.2d 942 (1956); *McGahhey v. McCollum*, 207 Ark. 180, 179 S.W.2d 661 (1944). One case phrased the question of navigability as "whether the lake is susceptible of public servitude as a means of transportation *either now or within the foreseeable future....*" *Parker v. Moore*, 222 Ark. 811, 814, 262 S.W.2d 891, 893 (1953). Thus, we do not believe that an area's navigability, in the sense that the public may use it, is conclusively established by that area's status in 1836.

Appellee also contends that navigability should be determined by the condition of the area in its natural state, without improvements. It bases its argument on the oft-repeated adage that a waterway is navigable "if, in its natural state, without artificial improvements, it may be prudently relied upon and used for that purpose." *See Lutesville Sand & Gravel Co. v. McLaughlin*, 181 Ark. 574, 577, 26 S.W.2d 892, 893 (1930). Appellee claims that, because the level of the water in the Echubby areas was artificially raised by the lock and dam, the areas cannot be navigable. First of all, there were no improvements made to the Echubby areas themselves; the inundation of water occurred as the result of improvements on another waterway, the Arkansas River. Second, we have found no Arkansas case, and appellee has cited none, in which the courts have held that a body of water should be closed to the public simply because it was rendered navigable through improvements made to another body of water. We therefore decline to affirm the summary judgment on this basis.

To conclude on direct appeal, we hold that fact questions remain as to whether the Echubby areas are navigable and as to whether the public has acquired a prescriptive right to use them.[3]

## Cross-Appeal

We turn now to the cross-appeal. On Monday, September 9, 2002, thirty-two days after appellant was served with appellee's motion for summary judgment, appellant asked the court for an extension of time to respond, stating that it needed "additional time to gather additional materials and exhibits in support of its response." The court granted the extra time, and appellant filed a response to the summary judgment on September 11. As previously mentioned, just one affidavit was filed in support of the response.

---

[3] Appellant also argues that it derived a right to use the Echubby areas by virtue of the federal government's perpetual flowage easements in the area. These are the easements referred to earlier in which we stated that we could not discern whether they encompassed the areas owned by appellee. Appellant did not make this argument below as a ground for resisting summary judgment, so we will not address it for the first time on appeal. *See Spears v. Spears*, 339 Ark. 162, 3 S.W.3d 691 (1999).

 Appellee objected below to the extension of time and argues on appeal that the trial court erred in allowing the late response. Appellee contends that, because appellant made its request outside the original twenty-one-day time period, it was bound to show mistake, inadvertence, surprise, excusable neglect, or other just cause, as mandated by Ark. R. Civ. P. 6(b), which governs enlargements of time. We disagree. Rule 56(c)(1) of the Arkansas Rules of Civil Procedure provides that the adverse party shall respond to a motion for summary judgment within twenty-one days after the motion is served. However, that same rule states that "[t]he court may by order enlarge the foregoing time periods." Rule 56 places no particular restrictions on the trial court in permitting an extension of time, and because Rule 56 is specifically directed to summary-judgment responses, the more general Rule 6(b) must yield. *See generally Benton v. Gunter*, 342 Ark. 543, 29 S.W.3d 719 (2000) (holding that a general statute must yield when there is a specific statute involving the particular subject matter); *Moon v. City*, 344 Ark. 500, 42 S.W.3d 459 (2001) (holding that court rules are construed using the same means, including the same canons of construction, as are used to construe statutes). In light of the fact that appellant's response was filed less than ten working days after it was due, that no previous extension had been granted, and that the response was filed almost sixty days before the hearing was held, we find no error in the court granting this enlargement of time.

Reversed and remanded on direct appeal; affirmed on cross-appeal.

NEAL and ROAF, JJ., agree.