Elizabeth PAGE *v.* Lamar ANDERSON

CA 03-418                                   157 S.W.3d 575

Court of Appeals of Arkansas
Division III
Opinion delivered April 7, 2004

*Rieves, Rubens & Mayton,* by: *Kent J. Rubens,* for appellant.

*Taylor Law Firm,* by: *W.H. Taylor* and *Scott E. Smith,* for appellee.

A ndree Layton Roaf, Judge. Appellant Elizabeth Page and appellee Lamar Anderson were divorced on May 31, 2002, after thirty-one years of marriage. Elizabeth now challenges four post-decree rulings in which the trial court: 1) refused to divide as marital property Lamar's undisclosed interest in a condominium, 2) awarded Lamar $8,850 in attorney fees, 3) refused to hold Lamar in contempt, and 4) held Elizabeth in contempt. We affirm the trial court's rulings.

The only area of contention in the parties' divorce was property division. On May 8, 2002, the parties agreed in open court on the division of a portion of their property, although the record does not contain the transcript of their agreement. The remainder of the property was divided by the trial court, and a decree was entered on May 31, 2002. The court's division of property in the May 31 decree is not in controversy, so we will not set out the details of the property division except where relevant to the contempt issues discussed later in this opinion. All issues on appeal arise from orders entered after the May 31 decree.

### Lamar's Interest In The Condominium As Marital Property

On May 10, 2002, two days after the final divorce hearing, Lamar executed a real-estate contract for the purchase of a condominium. He wrote the seller a $10,000 earnest-money check on May 12, the source of which is not revealed in the record, and closed on the purchase on July 3, 2002. Lamar's execution of the contract was not revealed to Elizabeth prior to the entry of the divorce decree. However, she discovered it at some point, and on August 16, 2002, she filed a motion to set the decree aside. She alleged that Lamar had fraudulently failed to disclose his interest in the condominium and asserted that, because the condominium was acquired prior to the divorce, it was marital property and should have been divided accordingly.

At a November 8, 2002 hearing on the motion, Elizabeth testified that she was entitled to an interest in the condominium because Lamar purchased it before they were divorced, because Lamar had "cheated" her, and because anybody would want to

"stick it to him." However, she acknowledged that she had nothing to do with his acquisition of the property. Lamar testified that he had not tried to defraud Elizabeth out of her interest in the property and that he had no agreement to buy the property before the divorce hearing on May 8.

The evidence adduced at the hearing revealed that Lamar had contemplated buying the condominium as early as December 2001 for his post-divorce residence. However, it was not until May 10, 2002, two days after the final divorce hearing, that Lamar actually signed a contract to purchase the condominium. According to Robert King of the Bank of Fayetteville, Lamar sought a $420,000 loan to purchase the condominium on June 4, 2002. King said that Lamar had not spoken to him about the loan prior to May 31, 2002. A loan commitment was drafted by King on July 1, 2002, for $420,000, to be secured by the condominium itself. According to King, there was no problem in getting the loan approved because the condominium appraised for $820,000.

Richard Alexander, one of the owners of the condominium, testified by deposition on September 3, 2002, that Lamar had been talking about buying the condominium "for months." However, it was Alexander's understanding that Lamar could not make the purchase until the divorce was final. Alexander told Lamar prior to the divorce proceeding the price for which he would sell the condominium and told Lamar that, if he got another offer, he would give Lamar a chance to match the offer. Ultimately, no one made an offer, and Lamar signed the contract on May 10, 2002.

The trial court declined to set aside the decree and ruled that Lamar had not committed fraud in connection with his purchase of the condominium. The court further declared that the condominium was not marital property but that, even if it was, an unequal division of it should be made to Lamar "based upon the Court specifically finding that the evidence indicates that the condominium was acquired by the sole contribution of [Lamar] and that [Lamar] was the only party at risk on the purchase of the condominium." Elizabeth contends that this ruling was in error.

■ This court reviews division of marital property cases *de novo. Copeland v. Copeland*, 84 Ark. App. 303, 139 S.W.3d 145 (2003). In reviewing a trial court's decision on whether an item is marital property, we will not reverse unless the court's ruling is clearly erroneous. *See Nicholson v. Nicholson*, 11 Ark. App. 299, 669 S.W.2d 514 (1984).

■ We first consider whether Lamar's execution of the real-estate purchase contract created a property interest. We believe that it did. In executing the contract, Lamar acquired the right to enforce the sale of the condominium. *See generally Bharodia v. Pledger,* 340 Ark. 547, 11 S.W.3d 540 (2000) (recognizing that the supreme court has allowed both the buyers and the sellers of land to seek specific performance on real-estate contracts); *Hawkins v. Lamb,* 210 Ark. 1, 194 S.W.2d 5 (1946) (recognizing that a buyer may sue for specific performance of a real-estate contract). Further, a contract for the sale of real estate creates in the purchaser an equitable estate that is alienable by deed. *See McKim v. McLiney,* 250 Ark. 423, 465 S.W.2d 911 (1971). Thus, in executing the contract on May 10, 2002, Lamar acquired an enforceable right, and our courts have recognized that enforceable rights may be classified as marital property, if acquired during the marriage. *See, e.g., McDermott v. McDermott,* 336 Ark. 557, 986 S.W.2d 843 (1999); *Wilson v. Wilson,* 294 Ark. 194, 741 S.W.2d 640 (1987).

Elizabeth contends that Lamar's rights in the condominium were acquired during the marriage because they were acquired prior to the entry of the divorce decree. She relies on the case of *Price v. Price,* 341 Ark. 311, 16 S.W.3d 248 (2001), for its holding that a divorce is not final until the divorce decree is entered as provided in Ark. R. Civ. P. 58 and Administrative Order No. 2. Lamar contends that his interest was not acquired during the marriage because it was acquired after the parties agreed to a property division at the May 8, 2002, divorce hearing.

■ It is undisputed that Lamar acquired an enforceable right to purchase the condominium on May 10, 2002, prior to the entry of the divorce decree. Given the clear holding in *Price* that the entry of the divorce decree determines the date of dissolution of the marriage, we cannot say that Lamar's interest was not marital property. He and Elizabeth were still married when he acquired his interest. We therefore must disagree with the trial court's conclusion on this point. However, we affirm the trial court's alternative decision to award the condominium to Lamar as an unequal division of marital property.

■ The overriding purpose of the property-division statute is to enable the court to make a division of property that is fair and equitable under the circumstances. *Hoover v. Hoover,* 70 Ark. App. 215, 16 S.W.3d 560 (2000). A trial judge's unequal division of marital property will not be reversed unless it is clearly

erroneous. *Keathley v. Keathley*, 76 Ark. App. 150, 61 S.W.3d 219 (2001). Arkansas law provides that, at the time a divorce decree is entered, all marital property shall be distributed one-half to each party unless the court finds such a division to be inequitable. Ark. Code Ann. § 9-12-315(a) (Repl. 2002). In the event the court finds that an equal division would be inequitable, it shall make some other division that it deems equitable, taking into consideration the many factors set forth in section 9-12-315(a)(1)(A), which include: length of the marriage; the age, health, and station in life of the parties; each party's occupation; amount and sources of income; vocational skills; employability; estate, liabilities, and needs of each party and their opportunity for acquisition of further assets and income; contribution of each party in the acquisition, preservation, or appreciation of the marital property, including services as a homemaker; and federal income tax consequences of the division of property. While the statute requires the court to consider certain factors and to state the basis for an unequal division of marital property, it does not require the court to list each factor in its order or to weigh all factors equally. *Keathley, supra.* Further, the specific enumeration of these factors does not preclude a trial court from considering other relevant factors, where exclusion of other factors would lead to absurd results or deny the intent of the legislature to allow the court to make an equitable division of property. *Id.*

■ We do not believe that the trial court's distribution of this property to Lamar was clearly erroneous. The court specifically found that the condominium was acquired by the sole contribution of Lamar and that Lamar was the only party at risk on the purchase of the condominium. Further, there is no evidence that Lamar used undisclosed marital funds to purchase the condominium. Moreover, he did not take title to it until after the divorce was final, and he intended to use the condominium as his post-marital residence. All of these factors support an equitable award of the condominium to Lamar as an unequal division of marital property. We therefore affirm the trial court on this basis.[1]

---

[1] We also note that the critical inquiry in property division cases is how the total assets are divided. *Copeland v. Copeland, supra.* Because the record does not contain a transcript of the parties' property-settlement agreement made in open court, we are uncertain if the divorce decree reflects a division of the parties' total assets.

## Attorney Fee Award

After a November 8, 2002, contempt hearing, the trial court informed Lamar's counsel that it would award attorney fees to Lamar, based on a finding that Elizabeth was in contempt. Counsel was asked to submit a bill and apparently prepared an affidavit setting out fees; however, the affidavit is not in the record. At a subsequent hearing, the court awarded Lamar's counsel $8,850 in attorney fees. Elizabeth filed a motion for reconsideration, alleging that, because the court had reduced Lamar's counsel's fee request by over sixty-six percent, the fee request was excessive and counsel should not be entitled to any fee at all. The court ruled as follows:

> [T]he attorney's fees awarded [to Lamar's] attorneys represents the amount which the Court believed a fair, just and equitable fee for plaintiff [Elizabeth] to pay. The Court arrived at that figure after considering all relevant factors set out by Arkansas case law, the Court's examination of the affidavit submitted by defendant's attorneys and the Court's personal observation of the proceedings.

(Emphasis in original.) Elizabeth argues on appeal that the trial court erred in awarding attorney fees to Lamar.

Courts have the inherent power to award attorney fees in a domestic relations proceeding. *Miller v. Miller*, 70 Ark. App. 64, 14 S.W.3d 903 (2000). The trial court has considerable discretion in the allowance of attorney fees in a divorce case, and, absent an abuse of that discretion, the fixing of the amount of fees will not be disturbed on appeal. *Id.*

Elizabeth argues that a lawyer who seeks to collect fees far in excess of a reasonable amount should be allowed no fee at all. She claims that such a practice violates Rule 1.5 of the Model Rules of Professional Conduct and allows lawyers to "pad" their fee requests. We are unable to reach the merits of this issue. The record does not contain the fee affidavit submitted by Lamar's counsel. Therefore, we have no way to verify that counsel asked for $23,285.32, as Elizabeth asserts, nor do we have any means to evaluate fees charged by counsel to determine if they are excessive or unreasonable. We do not consider matters outside the record to determine issues on appeal. *Arkansas River Rights Comm. v. Echubby Lake Hunting Club*, 83 Ark. App. 276, 126 S.W.3d 738 (2003). However, even if we were to reach the merits, we disagree with Elizabeth's characterization of the trial court's fee award as an

implicit finding that the total fees sought were unreasonable. It appears that the trial court, in awarding a lesser amount, was simply determining what portion of the fees Elizabeth should pay; there is no finding that counsel's overall request was inflated or unreasonable. We therefore affirm on this point.

### Failure To Hold Lamar In Contempt

Elizabeth argues that the trial court should have held Lamar in contempt for his failure to abide by the dictates of an April 3, 2002 order and for his failure to pay certain money to her as required by the May 31, 2002 divorce decree. We limit our discussion to Elizabeth's argument regarding the divorce decree because neither the April 3 order nor a portion of Lamar's testimony that Elizabeth asserts was in contempt of it are contained in the record. As stated earlier, we do not consider matters outside the record on appeal. *Arkansas River Rights Comm. v. Echubby Lake Hunting Club, supra.*

In dividing the parties' property in the May 31, 2002, decree, the trial court 1) ordered Lamar to deed his interest in the marital home to Elizabeth, for which Elizabeth would pay him $55,000, 2) ordered Elizabeth to convey her stock in Hugo's, Inc., to Lamar, for which Lamar would pay her $225,000, and 3) ordered that the parties' limited-liability company would convey a building at 25 North Block Street to Lamar, for which Lamar would pay Elizabeth $212,500. The court also ruled with regard to three lines of credit that the parties had at Arvest Bank, encompassing a $285,000 debt on the North Block Street building, a $76,000 debt on the home, and a $25,000 signature loan. Elizabeth was ordered to repay Arvest $68,742.99 that she had withdrawn from the three lines of credit, and each party was ordered to seek refinancing of one-half of the total debt remaining to Arvest.

Elizabeth contended at the November 8 hearing that Lamar should be held in contempt because he failed to pay her the $437,500 he owed under the decree, despite the fact that he had obtained a $600,000 loan commitment from the Bank of Fayetteville for that purpose. The trial court declined to hold Lamar in contempt.

Refusal of a trial court to punish an alleged contemnor will be reviewed by an appellate court only to determine whether there has been an abuse of discretion. *Warren v. Robinson,* 288 Ark. 249, 704 S.W.2d 614 (1986). We find no abuse of

discretion here. The loan commitment that Elizabeth refers to provides that the loan will be secured in part by a first mortgage on the building at 25 North Block. However, that building was still encumbered by a $285,000 mortgage at Arvest Bank. Lamar testified at the November 8 hearing that he could not follow through with obtaining the loan until the Arvest note was paid off. He complained that Elizabeth had not met her obligation to pay off one-half of the Arvest note and, thus, he was prevented from obtaining the Bank of Fayetteville loan. Elizabeth testified that she had been unable to refinance her one-half of the Arvest note, although she admitted that she could have paid off her one-half with stock that she received in the divorce settlement. She also recognized that the Bank of Fayetteville loan would be funded only if the bank could obtain a first mortgage on the 25 North Block Street building.

The trial court found that the parties were at a "stalemate" over the problem of freeing up the 25 North Block building, which would allow the exchange of money under the decree to begin. The court recognized that the parties seemed to be operating under the misunderstanding that the decree required each of them to pay off one-half of the Arvest lines of credit. In its order, the court clarified that neither party was required to pay off the Arvest lines of credit but were merely required to finance their one-half portion.

While the evidence indicates that either party probably could have worked out an arrangement to begin the money-exchange process, both seemed to believe that the other should pay all or part of the Arvest loans before such a process could begin. The court clarified that matter, directed each party to use his or her best efforts to meet their obligations under the decree, and provided that they could petition the court in a contempt proceeding should either fail to use his or her best efforts. In light of these factors, we find no abuse of discretion in failing to hold Lamar in contempt.

### Holding Elizabeth In Contempt

Elizabeth was held in contempt for failing to deliver certain items of personal property to Lamar as required by the divorce decree. The decree divided numerous items of tangible personal property, declaring some to be marital property, some to be the separate property of Elizabeth, and some to be the separate

property of Lamar. On July 19, 2002, Lamar filed a petition for contempt, asserting, *inter alia*, that, although Elizabeth had delivered some of his personal items to a storage unit on July 5, 2002, many items were either missing or damaged. Lamar's petition listed, with specificity, the missing and damaged items.

At the November 8 contempt hearing, the court viewed two videotapes, one that showed the contents of the marital home before the divorce decree was entered and one that showed the items that Elizabeth placed in the storage unit in July 2002. Lamar was able, in his testimony, to point out items on the videotape that were in the house prior to the divorce but were not provided to him in the storage unit. The trial court held Elizabeth in contempt for failing to provide Lamar with the items of property designated in the decree. However, the court withheld sentencing in order to allow Elizabeth to purge herself of contempt. The court directed the parties to examine and inspect the property at the former marital residence, where Elizabeth was residing, and to allow Lamar to take control of any property he believed to be his separate property. The parties went to the marital residence that same night, and several items of property were recovered by Lamar.

A hearing was held on January 9, 2003, for the court to determine what Elizabeth had done to locate the items that she was responsible for providing to Lamar. Lamar presented an exhibit to the court, showing the items that he had removed from the marital residence during the court-ordered visit on the night of November 8, 2002. Included among the items was a certain camera that Lamar was particularly anxious to get and that Elizabeth had vehemently denied knowing anything about at the November 8 hearing. Lamar also prepared an exhibit that showed the items that remained missing. When questioned about the missing items, Elizabeth testified that, regarding most of them, she had either already given them to Lamar or they remained missing. When asked what efforts she had made since November 8 to find the missing items, she said "there was not much to do." She admitted on cross-examination that she had not voluntarily handed over to Lamar any of the items that he retrieved from the house on November 8. She also said that she had not searched for the items "because I didn't have them," although she did say that she had gone through her house, guesthouse, and shop.

Following the hearing, the judge ruled that Elizabeth had failed to purge herself of contempt, and he sentenced her to two nights in jail. Elizabeth contends that the judge erred in holding her in contempt.

We will not reverse a trial court's finding of civil contempt unless that finding is clearly against the preponderance of the evidence. *Omni Holding & Devel. Corp. v. 3D.S.A., Inc.*, 356 Ark. 440, 156 S.W.3d 228 (2004); *Rogers v. Rogers*, 80 Ark. App. 430, 97 S.W.3d 429 (2003). In cases of criminal contempt, the appellate court views the record in the light most favorable to the trial judge's decision and will sustain the decision if supported by substantial evidence and reasonable inferences therefrom. *McCullough v. State*, 353 Ark. 362, 108 S.W.3d 582 (2003). We will not delve into the question of whether Elizabeth was held in civil or criminal contempt in this case because the trial court's decision is not reversible under either standard of review.

At the November 8 hearing, Elizabeth adamantly testified that she had provided Lamar with all property that was due him under the decree. Yet, when the parties visited her home that night, numerous items were found. Further, there was no evidence that Elizabeth cooperated in the retrieval of these items. As to the property that remained missing, Elizabeth's testimony at the January 9 hearing indicated that she had done virtually nothing to locate it, and she continued to insist that she had already provided it to Lamar. This evidence supports a finding that Elizabeth violated the provisions of the divorce decree and did not avail herself of the opportunity to rectify her violation. We therefore find no error in the trial court's decision to hold her in contempt.

Affirmed.

NEAL and VAUGHT, JJ., agree.