STATE of Arkansas *v.*
HATCHIE COON HUNTING & FISHING CLUB, INC.

CA 06-797                                                    254 S.W.3d 11

Court of Appeals of Arkansas
Opinion delivered March 21, 2007

[Rehearing denied May 2, 2007.]

*Mike Beebe*, Att'y Gen., by: *Charles L. Moulton*, Sr. Ass't Att'y Gen. and *Aheton M. Carter*, Ass't Att'y Gen., for appellant.

*Joe M. Rogers*, for appellee.

WENDELL L. GRIFFEN, Judge. This is an appeal from an order determining ownership of a forty-six acre island that lies in the St. Francis River in Poinsett County, Arkansas. The property, part of the St. Francis Sunken Lands near Marked Tree, is situated between the eastern and western shores of the river and was part of a 700-acre tract of land that appellee, Hatchie Coon Hunting and Fishing Club, purchased by patent in 1892 from appellant, the State of Arkansas.[1] The Club's land on the east and west sides of the St. Francis River is riparian; because the river itself was not included in the conveyance, the conveyance was fractional. After a bench trial, the trial court determined that Hatchie Coon owned the island.

We affirm the trial court's order because the evidence supports that the island was created by accretion to and avulsion from the Club's riparian property, because title to the Club's 700 acres was quieted in the Club in 1919, and because the State failed to prove its affirmative offenses of adverse possession and laches. Additionally, we affirm the trial court's decision to permit attorney Scott May to testify on Hatchie Coon's behalf. Even though May served as counsel for the Club and prosecuted part of this case, he did not testify in any proceeding in which he served as counsel.

## I. Factual Background

The subject property is an island located between Hatchie Coon's riparian property in sections 28 and 33 of Township 12

---

[1] Hereinafter, we refer to appellee as "Hatchie Coon" or "the Club."

North, Range 6 West, in Poinsett County.[2] The property that was granted to Hatchie Coon in the 1892 patent was originally surveyed by the Government Land Office (GLO) in 1849; this survey did not show the island. The GLO surveyed the land again in 1911 and 1920. The 1911 surveyor noted the presence of a small island located where the subject property lies that was densely populated by willow trees, but the surveyor did not indicate how large the island was or include it on the survey. The 1920 survey was conducted in response to a 1919 federal lawsuit to reconcile the property description in the 1892 patent with the 1911 survey, but the 1920 survey did not show the island. The subject property did not appear on any surveys until 1932.

In 1940, a federal-condemnation order was entered authorizing the construction of levees and flood-control measures in the Sunken Lands. This order also granted flowage easements for lands that would be left unprotected by the floodway. (A flowage easement allows the government to run water over private property.) The property conveyed in the 1892 patent was unprotected and thus, is subject to a flowage easement pursuant to the 1940 order.

Subsequently, pursuant to a federal law, the United States Army Corps of Engineers implemented a series of flood-control measures in part of the Sunken Lands, including levees, siphons, and gated structures that have operated since 1976. The flood-control structures are maintained by the Arkansas Game and Fish Commission (AGFC). Through these structures, the AGFC has since the 1980s artificially maintained the water level of the St. Francis Lake and the St. Francis River, including the Club's property, at 210 feet mean sea level (MSL), except during duck-hunting season, when the water level is maintained at 212 feet. Without flood-control measures, the water level would normally be 208 feet MSL, which would mean that the forty-six acre island would be above the ordinary high-water mark.

Although the Club knew that nonmembers were using the subject property for at least twenty-five years, it did not file suit in the instant case until 2001, when it sued three duck hunters who were operating duck blinds on its property. The State of Arkansas declined to voluntarily join the case on the ground that no state agency had an interest in the property; however, at the respective

---

[2] Neither party disputes the property description that is fully set forth in the trial court's order upon which this appeal is based.

defendants' requests, the State was ultimately joined as a necessary party to the case.[3]

A bench trial was held on August 22-24 and 29-31, 2005. The trial judge heard from numerous witnesses who testified regarding whether the St. Francis River was navigable, the placement of the ordinary high-water mark and historical high-water mark on the subject property, whether the subject property was formed by accretion and avulsion, whether the 1919 lawsuit quieted title to the property in Hatchie Coon, and whether the State proved its affirmative defenses of adverse possession and laches. Another issue was whether Scott Mays, an attorney and Club member who had prosecuted part of the case for the Club, should be allowed to testify. In short, the trial court allowed Mays to testify and further determined that the island belonged to Hatchie Coon. The relevant testimony and other evidence will be discussed further herein as they relate to the trial court's respective findings.

## II. Creation by Accretion

Although the State raises several issues on appeal, the first issue we address is how the property was created. Under Arkansas law, a riparian property owner gains title to accretions to his land, *formed or made prior to or after the conveyance*, even though the property is not mentioned in the deed of conveyance. See *Crow v. Johnston*, 209 Ark. 1053, 194 S.W.2d 193 (1946) (emphasis added). When a stream changes its course by accretion, the boundaries of a riparian owner's land change with the stream (thus, the owner retains title to the accreted land). *Id*; *see also Goforth v. Wilson*, 208 Ark. 35, 184 S.W.2d 814 (1945).

Thus, here, if the island was created by accretion to the Club's riparian property, then the Club owns the property above the high-water mark; if the island was created by accretion to the river bed, then the State owns the property. See *Arkansas River Rights Comm. v. Echubby Lake*, 83 Ark. App. 276, 126 S.W.3d 738 (2003).[4]

---

[3] The duck hunters were enjoined from using Hatchie Coon's property. However, they are not parties to this appeal because they filed notices of appeal but did not thereafter submit briefs.

[4] The "high-water mark" of a navigable stream is the line delimiting its bed from its banks and is to be found by ascertaining where the presence and action of the water are so

A trial judge's findings of fact will be affirmed on appeal unless they are clearly erroneous or clearly against the preponderance of the evidence, and this court shall give due regard to the trial court's opportunity to judge the credibility of the witnesses. *See* Ark. R. Civ. P. 52(a). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a firm conviction that a mistake has been committed. *Chavers v. Epsco, Inc.*, 352 Ark. 65, 98 S.W.3d 421 (2003). Disputed facts are within the province of the fact-finder. *Id.* We hold that the trial court did not err in finding that the island in this case belongs to Hatchie Coon because it was created by accretion to and avulsion from the Club's riparian property.

The State first argues that the Club failed to prove ownership by accretion because it failed to prove that the island was connected to its riparian land during the Club's record ownership. We do not agree. First, the Club's claim would not be defeated because it could not establish that the accretion occurred during its record ownership. The State cites to only one case, *Crow v. Johnston, supra,* for its assertion that a party claiming land by accretion is required to prove that "gradual additions of soil have been added to riparian land *during their record ownership.*" (Emphasis added.) However, the *Crow* court found that the accreted property did not accrete to the landowner's property because the landowner's property had washed away and had never reformed — that clearly is not the case here.

Obviously, the accretion must be contiguous to the landowner's other property at *some* point, but Arkansas law does not require Hatchie Coon to prove that the accretion was formed during the Club's record ownership. Such a requirement would completely undermine the rule that land carries with it all accretions formed or made *prior to and after the conveyance*, even though the accretion is not mentioned in the deed of conveyance. *See Crow, supra.*

Second, the Club's expert witnesses provided sufficient testimony on which the trial court could have concluded that the island was formed by accretion to the Club's property. While

---

usual and long-continued in ordinary years as to mark upon the soil of the bed a character distinct from that of the banks in respect to vegetation and the nature of the soil. *See Echubby, supra.* If water is navigable, members of the public have the right to use the water at any point below the high-water mark. *See Echubby, supra.*

expert witness testimony is not required to prove accretion, a witness's long familiarity with the river may qualify him to opine regarding how the property formed. *See Mallory v. Brademyer*, 76 Ark. 538, 89 S.W. 551 (1905).

■ The expert witness testimony here established that the shape of the property, its location in a bend of the river, the fact that it evolved during a sixty-year period from being underwater to being visible with a dense growth of trees, that it is not part of the river bed and is not temporary, and that it is clearly located in the bend of the river whose characteristics favor the process of accretion, all support that the property was created by accretion. *See contra Porter v. Arkansas Western Gas Co.*, 252 Ark. 958, 482 S.W.2d 598 (1972) (finding that a channel formation, which had no permanent character, no permanent vegetation, and which had been moving north for over 100 years, was simply a part of the river bed or a sand bar, and had not been formed as an island within the original boundaries).

### III.  Separation by Avulsion

The trial court also properly found that the island separated from the Club's riparian land by avulsion. Avulsion is a sudden and perceptible gain or loss of riparian land and may arise from the sudden abandonment by a stream of its old channel and the creation of a new one or the sudden washing from one of its banks of a considerable body of land and the depositing of it on the opposite bank. *See Wyatt v. Wycough*, 232 Ark. 760, 341 S.W.2d 18 (1961). Title to accreted land is not lost by avulsion. *Id.*

When land lines are altered by the movement of a stream, there is a strong presumption that the movement occurs by gradual erosion and accretion rather than avulsion. *See Pannell v. Earls*, 252 Ark. 385, 483 S.W.2d 440 (1972). Thus, avulsion is normally described as a "sudden" shift in a water boundary to distinguish it from accretion. *See White v. J.H. Hamlen & Son Co.*, 67 Ark. App. 390, 1 S.W.3d 464 (1999).

Just as there is no direct evidence that the property in this case was once *connected* to Hatchie Coon's riparian land, there is no direct evidence that the subject property was *separated* from the riparian land by avulsion. However, as with any area of law in which a presumption operates, the presumption in this case that the property change occurred by gradual erosion and accretion may be overcome by countervailing evidence. *See Arkansas Land &*

*Cattle Co. v. Anderson-Tully Co.*, 248 Ark. 495, 452 S.W.2d 632 (1970) (holding the evidence supported trial court's findings that the area occupied by a disputed tract of land in Mississippi river between states of Arkansas and Mississippi was within boundaries of the tract owned by the Arkansas landowner in 1825 and that the disputed tract of land appeared in the river between 1862 and the years 1872-1874 and was formed by avulsion).[5]

The State would apparently have us to require that a "sudden" and "perceptible" change for avulsion purposes be an "instantaneous" change. The law does not require this. Rather, in contrast to accretion, the test for avulsion is whether the change *can be perceived while it is happening. Compare, e.g., Wyatt, supra* (finding *avulsion* where witnesses testified that the river "perceptively" changed its course); *Nix v. Pfeifer*, 73 Ark. 199, 83 S.W. 951 (1904) (noting that the test of what is gradual and imperceptible for *accretion* purposes is that, though the witnesses may see from time to time that progress has been made, they could not perceive it while the process was going on).

Wesley Fornay, a civil engineer, testified that he could not say how long it took to cut off the property in this case. He said that the cutoff could have been formed in two or three years but admitted that it was possible that it had taken ten or fifteen years, or even fifty years. Ben Kittler, a surveyor-engineer, agreed that the island was separated by avulsion and that everything within the confines of the patent that is not in the bed of the river belongs to Hatchie Coon.

Dr. David Knowles, a retired civil engineering professor who is considered one of Arkansas's preeminent boundary experts, testified that avulsion may occur with one flood event or several. He further stated that it should not matter whether the avulsion is sudden and perceptible as long as the property owner can still identify the land as his land.

Even Dennis Ford, the State's civil engineer witness, believed that the land was separated by avulsion. Moreover, Ford recognized that the St. Francis River is the type of river in which avulsions tend to occur. He testified that the river at Marked Tree

---

[5] The State attempts to distinguish this case on the ground that it involved State line boundaries rather than riparian ownership rights. Nonetheless, because the State boundaries in this case *were riparian* (involving land in the Mississippi River between Arkansas and Mississippi) the case may be cited for the general proposition stated above.

is at a "constriction" point of a loop and "that necking down is where you would expect an avulsion to occur."

Regardless of the conflicting theories of how the property was created, each expert who opined regarding the separation issue opined that the property was separated by avulsion. In addition, two experts testified that the flooding necessary to cut off the property may require more than one flooding event and thus, may take place over a period of years. This is consistent with the finding in *Anderson-Tully, supra,* that avulsion may occur over a period of several years.

■■ To reverse would require us to hold that the trial court erred in not disregarding the consistent testimony of *each* expert witness in this case who testified regarding avulsion. Given that the property in question was created by accretion, that an avulsion theory is consistent with the type and location of the subject property in this case, and that St. Francis River is the type of river in which avulsions tend to occur, the trial court had a sufficient basis for concluding that the property was separated by avulsion, even though the expert witnesses could not describe a "sudden" avulsion event or state when the avulsion occurred. Accordingly, we affirm the trial court's findings that the property in this case was formed by accretion and was separated from the Club's riparian property by avulsion. It follows that the trial court correctly determined that Hatchie Coon retained title to the ground lying above the ordinary high-water mark and that the State's interest was limited to the flowage easement, the property below the high-water mark, and the right to travel atop the water. *See Echubby, supra.*[6]

### IV. Quiet-Title Action

Additionally, the rights that Hatchie Coon has in the subject property were quieted in it via the aforementioned 1919 quiet-title action. Although the Club did not originally plead that it

---

[6] The State seems to challenge the trial court's findings regarding the high-water mark when it asserts that the court erred in finding that the contested duck blinds partially rested on a small vegetation-covered island surrounded by shallow water. The State asserts that, "The erroneous finding of fact by the trial court that at 210 MSL 'islands' are still present and vegetated in the St. Francis River is contrary to all of the evidence adduced" and is "completely unsupported." Yet, the State offers no evidence to counter the trial court's finding. We do not address this "argument" which, at best, is conclusory.

owned the property by virtue of the 1919 quiet-title action, the issue was clearly litigated during the trial. Upon questioning, Kittler opined that the 1919 case quieted title in Hatchie Coon to properties that were subsequently indicated on the 1920 survey (which was ordered as a result of the 1919 case to correct the notation of public lands listed in the 1911 survey).

The State objected on the ground that the quiet-title order had not been submitted. The trial court noted that it had not seen any order quieting title, but said, "If he comes up with a court order that quieted title, that's a different question, I'm not closing that out." The State concedes that the order was subsequently admitted and the record does not reflect that the State objected below to its admission or objected that the quiet-title issue had not been tried by implied consent of the parties.

The quiet-title order plainly states:

> That the defendant, E.L. Westbrook, *Trustee for Hatchie Coon Hunting and Fishing Club is the owner in fee simple* of the following described lands, the title to which is forever quieted and confirmed in the said E.L. Westbrook to wit: The south half of the North half and the South half of Section 28 . . . also the N1/2 of Section 33 . . . all in Township 12 North, Range 6 East, Fifth Principal Meridian.

(Emphasis added.)

The State does not argue that the described lands do not encompass the subject property. Rather, it argues that there was no evidence that title was quieted to the subject property in 1919 because the quiet-title order does not specifically refer to the forty-six acre island. This argument is without merit because, as previously noted, a riparian property owner gains title to accretions to his land, formed or made prior to or after the conveyance, even if the accreted property is not mentioned in the deed of conveyance. *See Crow, supra; see also Mobbs v. Burrow,* 112 Ark. 134, 165 S.W. 269 (1914); *Crill v. Hudson,* 71 Ark. 390, 74 S.W. 299 (1903). Thus, accretions to land pass under title to the land, even if not mentioned in the conveyance. *Crow, supra; Mobbs, supra; Crill, supra.*

Further, the State's own witness, Cotton Green, a surveyor for the State Land Commissioner, admitted that the order quieted titled in Hatchie Coon to the described lands. Moreover, although

such proof was not necessary, that evidence demonstrated that the island had *already formed* prior to the 1919 case, as noted by a 1911 GLO surveyor, who described a small island that crossed the boundaries of sections 28 and 33, precisely where the subject island is located. Given these facts, the State's argument is unpersuasive that the record is devoid of any evidence to support the trial court's finding that the 1919 quiet-title action vested title in the island to the Club.

## V. Adverse Possession

■ The State also challenges the trial court's finding that it failed to prove title to the property by adverse possession because the State failed to follow the proper procedure to condemn the subject property, because the 1940 flowage easement is perma-nent, and because the request to flood the property was permissive. We affirm the trial court's determination that the State failed to prove entitlement to the property by adverse possession, albeit on a different ground than those cited by the trial court. We may affirm where a trial court reaches the right result for the wrong reason. *See Middleton v. Lockhart*, 355 Ark. 434, 139 S.W.3d 500 (2003).[7]

■ To prove the common-law elements of adverse pos-session, the claimant must show that he has been in possession of the property continuously for more than seven years and that his possession has been visible, notorious, distinct, exclusive, hostile, and with the intent to hold against the true owner. *See Rice v. Welch Motor Co.*, 95 Ark. App. 100, 234 S.W.3d 327 (2006). Because the State has historically disclaimed an interest in the property, we hold that it failed to demonstrate two essential elements of adverse possession: hostile possession and that the property was held with the intent to hold it against the true owner. The State's disinterest in the property is starkly evident in that it refused to voluntarily defend the litigation in this case on the ground that no State agency had an interest in the case.

Additionally, the documentary evidence proves that the AGFC considers the property as private property beyond the State's control. In August 1995, Scott May, a Club member, wrote

---

[7] We do not address any right the federal government retains in the subject property pursuant to the 1940 flowage easement because the federal government is not a party to this case.

to Robert Zachary (AGFC's Wildlife Management Division D-1 Supervisor since 1978) inquiring whether the AGFC would be interested in entering into a management agreement with the Club whereby the Club would lease the property to the AGFC, which would manage the area and prohibit the construction of new duck blinds — an area which included the subject property. Zachary declined to enter into such an arrangement on the ground that if the AGFC managed the area the agency would be required to open the property *to the public* and thus could not limit hunting to only Club members.

While the State points to the undisputed fact that the Club knew for at least twenty years that members of the public used part of the land to house duck blinds, and even leased a blind on Club property from someone else, that is of no moment for two reasons. First, incursions on the land of another for the purpose of hunting and fishing do not signify an intention to appropriate lands for one's own use. *See Echubby, supra.*

Second, the State has no privity to use the conduct of the duck hunters or Hatchie Coon to establish *its* adverse-possession claim. It is axiomatic that a party must rely on its own acts of ownership (or those of a predecessor) to establish an adverse-possession claim. However, the State has not engaged in any act of ownership that would put the Club or anyone else on notice that the State was claiming the property. The AGFC admitted that the only control it exercised over the area was manipulation of the water levels ( which the record shows was at the behest of specific requests made by interested members of the public, including Club members. Thus, the State never engaged in any act of control to assert its ownership right *to the exclusion of Hatchie Coon* (or anyone else).

Nonetheless, the State argues that it gained title to the property by adverse possession, and relies on *State ex rel Thompson v. Parker*, 132 Ark. 316, 200 S.W. 1014 (1917). In the *Thompson* case, the Arkansas Supreme Court found that the State proved adverse possession of 1,000 acres of property where the State artificially extended the boundaries of Horseshoe Lake and where the property had been *permanently and completely* submerged, and thus, had become part of the lake-bed.

However, the instant facts are distinguishable from the *Thompson* facts because the property here is not part of the riverbed, nor has it been completely and permanently inundated

by water. The instant property was created as a result of accretion to the Club's riparian property, which means it was *not* formed by accretion to the river bed. The evidence supports that a finding that the cypress trees present on the island could not have thrived unless the ground in which they germinated and first grew was above the water line — in other words, they did not form on property that was part of the riverbed. In fact, the evidence shows that the property evolved during a sixty-year period from being completely submerged to being visible with a dense growth of trees. Moreover, the clear evidence demonstrated that the historic high-water mark (without flood-control measures) was approximately 208 feet or less and that at that level, the subject property would be dry at least 60% of the time. Further, even with the artificial flood-control measures, some of the island remains above water. Thus, it cannot be said in this case that the State's "possession" of the island by flooding it was "open" where the State did not completely and permanently submerge the property "in such a manner [that] could not escape observation" as the State's flooding did in *Parker*.[8] *See Parker, supra* at 321, 200 S.W. at 1016.

Finally, the State maintains that the court erred as a matter of law because implied or involuntary permission does not defeat an adverse-possession claim. We agree that a party cannot defeat an adverse-possession claim by implied consent; however, that is of no moment because the consent here *was express*. In written letters to the AGFC, the Club expressly requested that the property be maintained at a specified, artificially high level to encourage duck hunting. In short, because the State failed to prove entitlement to the property by adverse possession, it cannot now divest Hatchie Coon of its title.[9]

## VI. Laches

The State also asserts that Hatchie Coon's claim is barred by the doctrine of laches. We disagree. The trial court's findings on this issue were as follows:

---

[8] The State inconsistently argues that *Thompson* applies (which necessitates that the subject be *completely* and *permanently* submerged) yet also argues that there was no evidence that the river was "flooded" when being maintained at 210 MSL.

[9] The Club has successfully defended its title against private property owners in previous cases, one of which involved the precise property at issue in this case. However, those cases involved the determination of ownership *between private parties*; because the State was not a defendant in those cases, they have no bearing on this appeal.

> The fact that both Defendants [the duck hunters] have for many years hunted in duck blinds located on the Plaintiff's property without objection or without complaint does not support a claim of laches. The Defendants actually benefitted from having a duck blind in prime hunting area without payment of several thousand dollars in customary fees per year. They suffered no damages as a result of having to move floating blinds. .

The doctrine of laches is premised on a party's detrimental change in position made in reliance upon the action or inaction of the other party. *See Arkansas County v. Desha County*, 351 Ark. 387, 94 S.W.3d 888 (2003). It is based on the assumption that the party to whom laches is imputed has knowledge of his rights and the opportunity to assert them, that by reason of his delay some adverse party has good reason to believe those rights are worthless or have been abandoned, and that because of a change of conditions during this delay it would be unjust to the latter to permit him to assert them. *Id.* Laches requires a demonstration of prejudice to the party alleging it as a defense resulting from a plaintiff's delay in pursuing a claim. *Id.*

The State points to the undisputed fact that Hatchie Coon was aware that duck hunters had been using their blinds for twenty-five years or more before they took any action to intervene and did not pay taxes on the property until 2001. Also, it notes there was testimony that the Club members rented one of the duck blinds at issue, thus demonstrating that they knew the Club did not own the property.

■ However, the fact that Hatchie Coon "sat on its rights" for many years is only one prerequisite to establish that laches bars the Club's assertion to title to the island. What is absent on the facts of this case, and indeed, in the State's argument regarding this issue, is evidence that *the State* changed *its position* to *its detriment* in reliance on Hatchie Coon's delay in pursuing its claim and that the State suffered prejudice in so doing.

The State argues that the public has consistently used and enjoyed the river and that it has expended considerable resources (no specific amount was alleged or proven) in maintaining the water level on the St. Francis River for the benefit of the public. Nonetheless, the State offered no proof that had it enjoyed title to the property, it would not have artificially maintained the water level or would not have allowed the public to use the property as the public has traditionally used it.

Thus, the fact that the Club "sat on its rights" did not require the State to expend money to artificially maintain the river's water level, where the State would not have otherwise done so. As such, the State failed to prove that it changed its position to its detriment or suffered any prejudice in reliance on the Club's conduct. Similarly, the fact that the Club rented some of the subject property to others has no bearing on the State's decision to artificially maintain the water level.

The case cited by the State, *Arkansas County v. Desha County*, *supra*, does not compel a different result. In that case, for fifty-five years, at the same time Arkansas County sat on its rights to the subject property, Desha County claimed and exercised control over the property — Desha County maintained the property records and collected taxes, and the property was part of its school district records. There are simply no such similar acts of ownership or control by the State in the instant case.

Further, in the *Desha County* case, there was no justification for Arkansas County sitting on its rights, which it did not assert until a benefit was to be gained from owning the property (taxes from a hydroelectric plant built on the property). By contrast, Hatchie Coon followed a good-neighbor policy for many years because at first, there were few unauthorized blinds and because many of its members lived outside of Arkansas and therefore, felt vulnerable to having their blinds vandalized in their absence if they tried to exclude people from the Club's property.

However, when the number of blinds increased to the point that the Club felt it was detrimental to duck hunting in the area, the Club began to sue to require the nonmembers to remove the blinds from its property. Thus, unlike the reluctant landowner in the *Desha* case that had no justification for sitting on its rights, the Club here had ample justification for not immediately suing fellow hunters who were trespassing on its property. On these facts, the trial court did not err in finding that Hatchie Coon's claim was not barred by the doctrine of laches.

## VII. *Testimony of Attorney Scott May*

The final issue is whether the trial court erred in permitting attorney Scott May to testify on Hatchie Coon's behalf when he had served as the Club's counsel and had prosecuted part of this case. May is also a longtime member and shareholder of the Club who sits on the board of directors. May is also an attorney licensed

to practice in Tennessee who was granted the right to practice by comity in this case. He served as lead counsel during the preliminary-injunction hearing, argued on the Club's behalf during the hearing on the Club's motion for summary judgment, and also participated in discovery and conducted depositions on the Club's behalf.

It is not necessary to recount in great detail the motions and objections filed regarding this issue. It is sufficient to note that May was allowed to prosecute the case until the trial court was convinced that May would be a material witness in the case. When May's participation in the trial as a witness was confirmed, the State filed a motion to strike him as a witness, citing Arkansas Model Rule of Professional Conduct 3.7, which states in relevant part, "A lawyer shall not act as an advocate at trial in which the lawyer is likely to be a necessary party." Citing to *Arthur v. Zearley*, 320 Ark. 273, 895 S.W.2d 928 (1995), and other cases, the State argues that May's testimony was prohibited by Rule 3.7 because he acted as an advocate in the same case in which he testified.

Generally, a trial court's decision regarding whether a witness may testify is within the sound discretion of the court and will not be reversed on appeal unless the trial court abuses its discretion. *See Matter of Tucker v. Tucker*, 46 Ark. App. 322, 881 S.W.2d 226 (1994). Abuse of discretion is discretion exercised improvidently or thoughtlessly and without due consideration. *Jones Rigging & Heavy Hauling, Inc. v. Parker*, 347 Ark. 628, 66 S.W.3d 599 (2002).

We affirm the trial court's decision to allow May to testify. Because May did not participate in the same trial in which he acted as a witness, his testimony was permitted. *See, e.g., Aetna Cas. & Sur. Co. v. Broadway Arms Corp.*, 281 Ark. 128, 664 S.W.2d 463 (1984) (holding that an attorney who had handled an insured's claim and continued to represent the insured in other suits brought against it could testify and also share in contingent fee, provided he completely withdrew from participation in case other than as a witness). In each case cited by the State, the attorney *served as a witness during the trial in which he also served as counselor*; thus, those cases do not compel reversal here. None of the cases cited by the State, not even the *Zearly* case on which it so heavily relies, involved the situation we have in this case, where May first served as counsel in preliminary proceedings and discovery but subsequently withdrew and never served as counsel during any proceeding in which he served as a witness.

Moreover, none of the various interests that Rule 3.7 is designed to protect were violated by the admission of May's testimony. The only interest that is possibly implicated is the concern that opposing counsel may be handicapped in cross-examining and arguing the credibility of trial counsel who also acts as a witness. The State attempts to assert that it suffered that precise prejudice because it was forced to conduct a last-minute deposition of May one week before trial.

However, the record does not support that the State was hampered in its ability to defend its case due to May's testimony. On July 19, 2005, more than one month before the hearing, the State received a letter notifying it that May was withdrawing as counsel and identifying him as a potential witness. Although the State argues that it did not receive confirmation until August 10, 2005, two weeks before trial, we are hard-pressed to conclude that the State was prejudiced by the admission of May's testimony where the State apparently did not request an extension for discovery or a continuance and where many of the points the State argues for reversal are based on testimony elicited from May. In any event, even if the trial court erred in admitting May's lay testimony, such error was harmless, given that the remainder of the evidence, exclusive of May's testimony, supported the trial court's findings.

Affirmed.

HART, VAUGHT, and HEFFLEY, JJ., agree.

PITTMAN, C.J., and BIRD, J., dissent.

JOHN MAUZY PITTMAN, Chief Judge, dissenting. I believe that the majority opinion is laden with superfluous facts and unduly complicates what is essentially a simple issue. Whether the entire property is permanently and totally submerged, and whether the property was formed by accretion or avulsion, are points that are interesting but irrelevant. Furthermore, because the State is only claiming that part of the property that is submerged, it simply does not matter that isolated portions of the property are not, in fact, part of the riverbed. The crucial issue in this case is adverse possession. I would reverse and remand because adverse possession was conclusively established at trial.

The majority asserts that the State cannot demonstrate the hostile intent necessary to prove adverse possession because it never attempted to exclude any member of the public from the

property, and because it is not "in privity" with the duck hunters who have undisputedly used the disputed property for over twenty years. This is specious. This case began because duck hunters who *had* used the property for many years claimed that they were entitled to continue doing so because a public right to do so had been established by widespread public use of the property for hunting purposes. The State, reluctantly, was joined in the proceedings. The State itself never adversely possessed the property and does not claim to have done so. Nevertheless, given its interest in riparian property, public lands, and the regulation of hunting and fishing in Arkansas, the State was a proper party for permissive joinder and has standing to represent the public at large on appeal by asserting *on behalf of the public* that public title by prescription was created by long, notorious, and hostile use of the property for hunting and fishing *by the public. See, e.g., State ex rel. Thompson v. Parker*, 132 Ark. 316, 200 S.W. 1014 (1917), *cert. denied*, 247 U.S. 512 (1918).

The majority relies on the general rule that incursions into the land of another for the purpose of hunting and fishing do not signify an intention to appropriate land's for one's own use. It should be added that this rule is applicable only to unenclosed lands, and its ancient origin was explained by the Arkansas Supreme Court over 150 years ago:

> In *Broughton vs. Singleton*, 2 *Nott & McCord's R.* 338, Mr. Justice JOHNSON said: "Our ideas of those injuries, for which the action for trespass will lie, are principally derived from the English authorities, and I am disposed to think they are followed, without a proper regard to the vast difference between the situation of the two countries, so that in pursuing the letter, we lose sight of the principle. There, almost every foot of soil is appropriated to some specific purpose; here, much the greater part consists in unenclosed and uncultivated forest, and a part in exhausted old fields, which have been abandoned, as unfit for further cultivation, in which the cattle of the citizens feed at will. There, it is as practicable as necessary to protect the occupants against those petty trespasses; here, it is wholly impracticable; and, I think, unnecessary. The attempt to give this protection to unenclosed land, would overwhelm us in a sea of petty litigation — destructive of the interest and peace of the community. Upon this principle, it was determined in the case of *McConico vs. Singleton*, 2 *Con. Rep.* 244, that hunting on unenclosed lands, was not such a trespass as would sustain an action," &c.

*Bizzell v. Booker*, 16 Ark. 308, 319 (1855). I think this is instructive, and that we, too, should beware of pursuing the letter of the law only to lose sight of the principle. Although it may be good and sensible policy in the usual case to hold that use of unenclosed lands for hunting or fishing is not sufficient to put the landowner on notice that the use is hostile, this is not a usual case. Because the property in question has been inundated with water for decades, *the only possible use* that can be made of the property is to tie a boat to the tip of a long-submerged tree for the purpose of hunting or fishing, and the appellee has not only admittedly permitted the public at large to use the property for this purpose without protest for a period in excess of twenty years, its members have actually *paid strangers to the property* for the privilege of using the property which it now claims to own.

Without regard to whether appellee consented to the innundation, and without regard to whether the initial use by the public was permissive, appellee's acquiescence for decades to the public's placement and use of duck blinds on the property caused any initial permissive use to change over the years to hostile use sufficient to establish adverse possession. There was extensive evidence that members of the public have attached duck blinds there for decades before this suit was brought. At the preliminary injunction hearing, for example, Don Hancock testified that his father's duck blind had been there for thirty-eight years. At trial, the individual defendants testified further about their decades-long use of the area.

This testimony was not denied by appellee. To the contrary, Mr. May admitted that, between 1965 and 1990, appellee did not put up any boundary-line markers; that it told no one not to hunt or fish on the property; and that it never asked anyone to move the Hancock blind, which was "the best, or the second best blind on the river." He also admitted that, in the early 1970s, he himself actually *paid* to use the property when he rented the Hancock blind from a Mr. James, and later, other club members rented it from Mr. James's grandson. In fact, he said, there were about six blinds by non-members on the area in question.

Mr. May explained appellee's failure to take action for so many years as follows:

> One, we're kind of an absentee owner. Most of our members live in Memphis. We've got a significant investment over there in clubhouses and tractors and boats, and boathouses, all that kind of

stuff that could be easily tampered with and destroyed if the people in the area were mad at us. We perceived that raising much Cain with blind owners might generate that madness. And at the time, back before the 90's, when suddenly more blinds came in, it wasn't affecting our rights enough to take any action on it. That's why we didn't take any action — not that we didn't recognize our rights — we just thought it would be better for the club not to take action.

Permissive use can become adverse if notice of hostility has been brought home to the owner by holding so open and notorious as to raise a presumption of notice equivalent to actual notice. *Tolson v. Dunn*, 48 Ark. App. 219, 893 S.W.2d 354 (1995). I submit the only possible conclusion to be drawn in this case is that the uninterrupted public use gave rise to the public's title by prescription, and I would reverse on that basis.

BIRD, J., joins in this dissent.