STATE of Arkansas *v.* HATCHIE COON HUNTING & FISHING CLUB, INC.

07-356                                                279 S.W.3d 56

Supreme Court of Arkansas
Opinion delivered March 6, 2008

[Rehearing denied April 10, 2008.\*]

---

\* GUNTER and DANIELSON, JJ., would grant rehearing.

*Dustin McDaniel*, Att'y Gen., by: *Justin Allen*, Chief Deputy Att'y Gen., *Charles L. Moulton*, Sr. Ass't Att'y Gen., and *Asheton M. Carter*, Ass't Att'y Gen., for appellant.

*Fogleman & Rogers*, by: *Joe M. Rogers*, for appellee.

R OBERT L. BROWN, Justice. The State of Arkansas appeals from the entry of a permanent injunction and a finding that appellee Hatchie Coon Hunting and Fishing Club, Inc. (Hatchie Coon), by riparian rights, retained ownership to an accreted, submerged forty-three to forty-eight acre island (the island) on the St. Francis River. We agree with the State that the circuit court erred, and we reverse and remand for entry of an order in accordance with this opinion.

In 1892, a group of hunters and fishermen from Memphis, Tennessee, known as the Hatchie Coon Hunting and Fishing Club[1], acquired title to approximately 700 acres of land along the St. Francis River in Poinsett County by a patent from the State of Arkansas. A majority of this land lies west of the St. Francis River, but a portion lies east of the river. At some point in time, Hatchie Coon maintains that, as riparian landowners, it obtained title to the island by accretion and then by an avulsion, which separated the accreted land from the west river bank. In 1940, the United States District Court for the Eastern District of Arkansas entered an order in favor of Drainage District 7 of Poinsett County and others, and

---

[1] Hatchie Coon Hunting and Fishing Club, Inc. has operated as an Arkansas not-for-profit corporation since 1932.

in cooperation with the United States Corps of Engineers, condemning and providing just compensation for a flowage easement over and across certain land owned by Hatchie Coon as well as other land along the St. Francis River for the purpose of constructing levees, siphons, and gated structures as flood-control measures.

At the request of members of Hatchie Coon and the St. Francis Lake Association, the Arkansas Game & Fish Commission has artificially elevated the minimum water level of the St. Francis Lake and St. Francis River by means of a gated structure built by the U. S. Corps of Engineers in the late 1970s. The Arkansas Game & Fish Commission has maintained the artificial water level at 210 feet mean sea level (MSL) since the early 1980s, except during duck-hunting season, when the water level is maintained at 212 feet MSL.[2] Without the artificial raising of the water level, the ordinary high water mark in this area would be approximately 208 feet MSL.

The island at issue in this case is located between the banks of the St. Francis River in Poinsett County. The island did not formally appear on any surveys of the Hatchie Coon land until 1932. Because the water level affecting the island has been artificially maintained by the Arkansas Game & Fish Commission at 210 feet MSL since the early 1980s, virtually all of the island is covered by a shallow layer of water. Members of the public have been duck hunting on the island since the 1960s or earlier. In the mid-1990s, Hatchie Coon began requesting that public duck hunters cease from hunting on the island. Some complied, while others did not. Hatchie Coon did not start paying real estate taxes on the island until 2001.

On December 11, 2001, Hatchie Coon filed a complaint against Don Hancock seeking a preliminary injunction to prevent him from trespassing on Hatchie Coon's property by hunting from a duck blind on the submerged island.[3] The complaint alleged that the island was created by an avulsion that occurred sometime prior to 1930, which cut off land that had accreted to Hatchie Coon's land along the west bank of the St. Francis River. The complaint asserted that title to the island accrued to Hatchie Coon by means

---

[2] St. Francis Lake is located south of the island that is the subject of this litigation.

[3] The complaint also named Ken Hancock and Larry Hancock as defendants. A consent order was later entered granting a permanent injunction preventing Ken and Larry Hancock from trespassing on Hatchie Coon's land.

of the accretion and did not change because of the avulsion. Thus, according to the complaint, Hatchie Coon retained ownership of the island.

Hatchie Coon further alleged in its complaint that Hancock was maintaining a "floating" duck blind in the middle of the island and had failed to remove the duck blind at Hatchie Coon's request. Hatchie Coon sought damages in the amount of $40,000 and a preliminary injunction requiring Hancock to remove the duck blind from the island. Hancock answered the complaint and asserted that his father had purchased the duck blind from another individual during the 1960s and that the duck blind had been in existence on the island for many years prior to that. Hancock asserted that Hatchie Coon did not own the island under the artificial high water mark and that the State of Arkansas owns the St. Francis River Channels and any land below the high water mark as trustee for its citizens.

Hancock next moved to join the State of Arkansas as a necessary and indispensable party, which was granted by the circuit court. After a hearing on the request for preliminary injunction, the circuit court entered an order on November 22, 2002, granting a preliminary injunction and requiring Hancock to remove the duck blind from the island.[4]

Following a bench trial, the circuit court entered a second order on December 14, 2005, in which it granted a permanent injunction in favor of Hatchie Coon to prevent the defendants from trespassing on the island and ordering the defendants to remove their duck blinds permanently from Hatchie Coon's land. The circuit court found in its order that the St. Francis River was navigable for recreational purposes but ruled that Hatchie Coon retained title to the land based on the ordinary high water mark, 208 feet MSL, irrespective of the fact that the island was submerged by an artificial water level of 210 MSL. The court wrote:

> Plaintiff retains title to the ground lying above the ordinary high water mark beneath said shallow waters and Defendants and other members of the public have no right to rest, attach or affix a duck blind or other structure on or to said property without any extension thereof, such as an island, tree, bush or otherwise.

---

[4] The case was later consolidated by the circuit court with a similar lawsuit filed by Hatchie Coon against Mike Campbell and Robert Hendrix, Jr., in which Hatchie Coon had also alleged that the defendants were trespassing by maintaining a duck blind on the island.

That title to Plaintiff's lands lying outside the bed of the St. Francis River as same existed prior to 1940 and specifically including lands upon which Defendants' duck blinds were located, remains in Plaintiff subject only to the flowage easement acquired by governmental agencies in 1940 and the right of the public to traverse atop the waters of said area.

. . . .

The historic high water records from the Oak Donnick gauge suggest that the ordinary high water mark was approximately 208 or less, such that at least 60% of the time the island on which the Hancock blind was located would be dry land if not artificially regulated at 210 MSL to 212 MSL by the control measures built by the Corp (sic) of Engineers. From the evidence, the Court concludes that the island in question would be above the ordinary high water mark if not controlled and that the ordinary high water mark basically corresponds to the line of cypress trees along both side (sic) of the main (west) channel of the St. Francis River. Accordingly, the State does not have an interest in the property in question even if the Court determined the St. Francis River to be navigable.

The circuit court further found that the island was created by accretion and was cut off from Hatchie Coon's property by an avulsion, which gave Hatchie Coon, the riparian landowner, title to the land. The court, in short, rejected the State's claim that it had acquired title to the island by adverse possession as well as any claim that Hancock, Campbell, or Hendrix acquired any interest in the property by prescription or adverse possession. The circuit court ruled that the fact that the individual defendants had maintained the duck blinds on Hatchie Coon's property for many years did not support a claim of laches, as the defendants suffered no damages from having to remove the duck blinds.

The State appealed from the circuit court's order granting the permanent injunction,[5] and the court of appeals affirmed the circuit court's order. *See State v. Hatchie Coon Hunting & Fishing Club, Inc.*, 98 Ark. App. 206, 254 S.W.3d 11 (2007). This court

---

[5] Hancock, Campbell, and Hendrix all filed notices of appeal but never filed appellate briefs.

subsequently granted the State's petition for review.[6] When we grant a petition for review from a decision of the court of appeals, we treat the appeal as if it had originally been filed in this court. *See McGrew v. Farm Bureau Mut. Ins. Co. of Arkansas, Inc.*, 371 Ark. 567, 268 S.W.3d 890 (2007).

The State's focus in this appeal is its argument that the circuit court erred in rejecting its adverse possession claim. It contends that pursuant to *State ex rel. Thompson v. Parker*, 132 Ark. 316, 200 S.W. 1014 (1917), when navigable waters are extended by artificial means for a continuous period of time sufficient to produce a new ordinary high water mark, the State acquires title to the inundated areas after passage of that continuous period of time by adverse possession. In light of *Thompson*, the State contends that the circuit court erred in ruling that its adverse possession claim fails just because the State never initiated condemnation proceedings, gave notice, or paid compensation for the island. Rather, the State asserts that under *Thompson*, it does not have to condemn land or pay compensation in order to acquire submerged land by adverse possession. The State contends, too, that it was not required to give notice to Hatchie Coon of its intention to take the island, as it is undisputed that the island has been submerged by water for more than twenty-five years.

The State also argues that the circuit court's determination that the 1940 condemnation case for purposes of flood control and letters submitted to the Arkansas Game & Fish Commission by Hatchie Coon's members in the 1970s constituted Hatchie Coon's permission to submerge the island, and, thus, defeated the State's adverse possession claim, was clearly erroneous. First, the State claims that the 1940 condemnation case had nothing to do with artificially altering the ordinary high water mark of the St. Francis River. Stated differently, the State maintains that there is no nexus between the Arkansas Game & Fish Commission's operations to raise the water level artificially beginning in the early 1980s and the 1940 condemnation case to implement flood-control measures. Thus, the State concludes that the 1940 condemnation case in no way supports Hatchie Coon's position that it gave the Arkansas Game & Fish Commission permission to maintain an elevated

---

[6] The State abandoned several of its arguments on appeal at oral argument, including its laches argument, its argument regarding the effect of a 1919 quiet-title action, and its argument regarding title by accretion and avulsion, and, therefore, this court need not address them.

water level artificially and permanently submerge Hatchie Coon's island property. As a final point, the State contends that the letters sent to the Arkansas Game & Fish Commission in the 1970s by Hatchie Coon's members requesting that the water level be elevated generally for the St. Francis River and Lake for duck hunting did not provide express or specific permission to submerge the island. The State also asserts that any "implied" or "involuntary" permission theories espoused by Hatchie Coon as a defense to adverse possession should be rejected by this court.

Hatchie Coon responds that the circuit court correctly ruled that the State has not acquired rights to its island by adverse possession and that the circuit court's reasoning for its decision is sound. Hatchie Coon further argues that implied, as well as express, permission defeats a claim for adverse possession. The Club insists that the flowage easement in 1940 as well as Hatchie Coon's repeated requests for the Arkansas Game & Fish Commission to raise the water level of the St. Francis River and Lake in the 1970s constitute implied consent to submerge the island, and therefore, defeats the State's adverse possession claim.

We begin our analysis by acknowledging the public policy of this state. When islands are formed in the navigable waterways of this state, title to those islands is in the State. *See* Ark. Code Ann. §§ 22-6-201(a), 22-6-202(a) (Repl. 2004). *See also* Ark. Stat. Ann. § 10-601 (Repl. 1976). The General Assembly has also spoken regarding submerged islands:

> (d) It is further the intent of this subchapter to establish the policy that all submerged lands following the navigable waterways of this state shall remain in the state domain. "Submerged lands" shall be those lands found at and below the line of ordinary highwater and shall include, but not be limited to, the beds, channels, chutes, and adjoining areas of rivers, lakes, and streams.

Ark. Code Ann. § 22-6-201(d) (Repl. 2004).

We turn then to the *Thompson* case, which, we note, was not addressed by the circuit court in its order.[7] In *Thompson*, the Five Lakes Outing Club owned a large body of land within the

---

[7] The *Thompson* case has been cited with approval in *State ex rel. O'Connor v. Sorenson*, 271 N.W. 234 (Iowa 1937) and 3 Am. Jur. 2d *Adverse Possession* § 265 (2002). *See also Diana Shooting Club v. Lamoreaux*, 89 N.W. 880 (Wis. 1902) (recognizing general proposition that if

peninsula of Horseshoe Lake in Crittenden County. A levee was built across the only outlet for the waters of the lake, which caused the waters of the lake to permanently submerge approximately 1,000 acres of the Club's land. The State filed an action to prevent the Club from building a fence surrounding the submerged land, and the trial court dismissed the State's complaint.

On appeal, this court recognized that before the levee was built, the land in question was owned by the Club and was not part of the bed of Horseshoe Lake. We explained, however, that title to the bed of navigable waters up to the high water mark lies in the State, and we held that the State, as trustee for the public, acquired title to the land in question by prescription because once the levee was built and the disputed land was inundated, it caused the land to become part of the bed of Horseshoe Lake. Furthermore, we underscored the fact that the land had been submerged for more than seven years. Under these circumstances, this court concluded that "the artificial level of the lake to high-water mark must be regarded as the natural level, and treated as such in determining the title and rights of riparian owners whose lands have thus been made a part of the permanent lake bed." *Thompson*, 132 Ark. at 321, 200 S.W. at 1016. We said:

> When the waters of natural navigable lakes in this State are extended by artificial means so as to cause the land of riparian owners to be flooded, *without their consent,* and this condition is not merely temporary, but is continued for a sufficient length of time for the standing waters to produce a distinctive new high-water mark for the waters of the lake bed, this gives the State, as the owner of such lake bed, the possession of the lands so covered to the high-water mark. Such possession is open, for a complete submergence of one's lands in this manner could not escape observation, and, if the owner is powerless to remove the cause and to restore the lands to their former condition, such possession is also adverse, and if it continues for seven years or more without interruption the State acquires the title to the lands so submerged, for, in such case, they have become a part of the natural lake bed.

. . . .

---

land is artificially submerged for the statutory period necessary to change ownership of the land, title to the submerged land is passed to the State in trust for the public).

> The common right of hunting and fishing in such navigable waters is not reserved to the public as a right attached and incident to the right of navigation, but it is one that inheres in the public in our State, because the State, in trust for the public, is the owner of the soil in navigable waters to high-water mark, and the common right of hunting and fishing is incident to such ownership, as well as the other common right of navigation.

*Id.* at 321-24, 200 S.W. at 1016-17 (emphasis added); *see also Arkansas River Rights Comm. v. Echubby Lake Hunting Club*, 83 Ark. App. 276, 126 S.W.3d 738 (2003) (stating that *Thompson* remains good law).

■ We hold that the *Thompson* case is applicable and resolves the case at hand. Here, the State holds title to the bed of the St. Francis River because the circuit court found that the St. Francis River is navigable for recreational purposes. The circuit court was correct. *See State v. McIlroy*, 268 Ark. 227, 595 S.W.2d 659 (1980) (extending definition of navigable waters to those waters suited only for recreational purposes). Though title to the island may well have accrued to Hatchie Coon by accretion at some point in time, the water level of the St. Francis River in this case has been artificially extended so as to cause the island to become submerged since the early 1980s, which is analogous to the artificial extension of the navigable waters in *Thompson*.

The fact that the island has been inundated since the early 1980s is not really in dispute. Hatchie Coon admitted in its initial complaint that the island in question is covered by a shallow layer of water. Furthermore, testimony at trial clearly indicated that the vast majority, if not all, of the island is habitually submerged. Several witnesses testified that the ordinary high water mark of the island is 208 feet MSL. However, it is clear that the Arkansas Game & Fish Commission maintains the water level of the St. Francis River at 210 feet MSL for most of the year, except during duck-hunting season, when the water level is maintained at an even higher 212 feet MSL, which results in inundation of the island.

We note that there was conflicting testimony at trial regarding the current high water mark, and it appears that the circuit court failed to make a finding as to the exact measurement of the

current high water mark.[8] However, regardless of where the high water mark is currently located, the island has been submerged for approximately twenty-five years, clearly more than the seven years required for the State to acquire title by adverse possession, and the artificial high water mark is above the original high water mark of 208 feet MSL.

Hatchie Coon, nonetheless, urges that even if *Thompson* applies, the Club consented to and gave permission for the submersion of its island, which distinguishes the facts of *Thompson* from the facts of this case. It insists that the riparian landowner in *Thompson* did not consent to having the land submerged, whereas in this case, it impliedly consented to the flooding of the island by virtue of its support for the 1940 condemnation proceeding which resulted in flood-control measures and its requests to the Arkansas Game & Fish Commission to maintain the water level of the St. Francis River and Lake at 210 feet MSL in the 1970s.

This court, however, does not see a connection between the 1940 condemnation proceeding for the entire St. Francis River area and the permanent inundating of the island in the early 1980s. The 1940 condemnation order did not give the federal or state government the right to flood the island permanently or alter the ordinary high water mark of the St. Francis River by artificial means. Moreover, there is no evidence that Hatchie Coon gave permission for Drainage District 7 of Poinsett County to take a flowage easement in 1940 over its island. Rather, the flowage easement was granted by way of condemnation, and whether or not Hatchie Coon gave permission for the flowage easement is largely irrelevant.

Regarding the letters written in the 1970s, we fail to see their applicability to the island. Clearly, the letters written by Hatchie Coon to the Arkansas Game & Fish Commission do not constitute consent to submerge the island, which would render it part of the river bed. Rather, the letters introduced requested that the Arkansas Game & Fish Commission sponsor and operate a gated structure on the St. Francis River to elevate the water level artificially to improve duck hunting in general for the entire area

---

[8] The circuit court found only that "the island in question would be above the ordinary high water mark if not controlled and that the ordinary high water mark basically corresponds to the line of cypress trees along both side (sic) of the main (west) channel of the St. Francis River."

and specifically in the St. Francis Lake located south of the island. At no time do the letters state that Hatchie Coon expressly permitted the Arkansas Game & Fish Commission to submerge the island with the elevated MSL; nor do the letters written on behalf of Hatchie Coon in 1990 provide express permission. Indeed, Hatchie Coon's witness at trial (Scott May) admitted that the letters did not contain express consent to submerge the island.

■ Hatchie Coon, though, contends that these letters evidence its implied consent to the submersion of the island and that implied consent is sufficient to defeat a claim for adverse possession or prescriptive easement. We disagree. In *White River Levee District v. Reidhar*, 76 Ark. App. 225, 230, 61 S.W.3d 235, 238 (2001), the court of appeals rejected the argument that implied permission defeated a claim of adverse possession and explained that it was "unwilling to hold that a collateral benefit that results to the owner from a possessor's use is sufficient to declare the use permissive." We adopt the reasoning in the *Reidhar* case.

■ In the case now before this court, there is no evidence that Hatchie Coon expressly consented to the permanent flooding of the island. To reiterate in part, in its letters to the Arkansas Game & Fish Commission, Hatchie Coon consented to a general raising of the water level of the St. Francis Lake area for wildlife purposes but never mentioned or consented to the flooding of the island in question. There is also the point that Hatchie Coon has not argued on appeal that it gave express consent to flood the island but only that its consent was by implication. Finally, Hatchie Coon did not begin paying real estate taxes on the island until 2001, although it did begin invoking its property rights against members of the public hunting on the island in the early to mid-1990s. More was required on the part of Hatchie Coon to establish its consent to the island's inundation. The circuit court clearly erred in finding that Hatchie Coon consented, either expressly or implicitly, to the inundation of the island.

The dissent questions the State's adverse possession claim to the island in the navigable waterway. But what is a more hostile, open, and notorious taking than the State's artificial submersion of the island that Hatchie Coon claims ownership in by accretion and then avulsion? The express public policy of the State for decades has been that submerged islands are the property of the State. *See* Ark. Code Ann. §§ 22-6-201(a), 22-6-202(a) (Repl. 2004). More-over, artificially submerged islands become the property of the

State by adverse possession, if the submersion continues for seven years or more, absent consent. *See State ex rel Thompson v. Parker, supra.* The *Thompson* case has been part of Arkansas's jurisprudence for ninety-one years.

We disagree with the dissent that Hatchie Coon ever consented to the submersion of the island. Indeed, Hatchie Coon admitted it never expressly consented to submersion of the island. As counsel for Hatchie Coon stated at oral argument, Hatchie Coon favored increased water levels for the entire St. Francis River Lake area for better wildlife habitat. However, it never expressly consented to the State's flooding of the island. For this court to embrace a theory of consent by implication due to some collateral benefit realized by Hatchie Coon as a defense to an obvious taking would severely curtail the State's rights with respect to navigable streams and rivers, as the State correctly points out. As already said in this opinion, Hatchie Coon needed to do more to bring its ownership claim of the island to the attention of the Arkansas Game & Fish Commission and to establish its consent to the island's flooding. Here, Hatchie Coon did not act until the early to mid-1990s to lay claim to the submerged island and to force the removal of the public hunters from the island, which was after the seven-year period to support the State's claim to adverse possession had passed.

The dissent also suggests that the raised water level to 210 MSL in the St. Francis River and Lake was at the sole request of Hatchie Coon and for its benefit. Not so. The increased water level was for the purpose of enhancing wildlife habitat for the entire area, which means public lands and private lands alike. The water level was not raised merely to benefit Hatchie Coon.

■ For all of these reasons, we hold that *Thompson* controls this case, that Hatchie Coon did not consent to submerging its accreted island, and that the circuit court erred in ruling that the State did not acquire title to the submerged island by adverse possession. We further hold that the State did acquire title to the island by adverse possession for the public trust and for the public's use. By continuous submersion of the island for more than seven years, an artificial high water mark has been established, and the submerged island has become part of the river bed and thus the property of the State. *See* Ark. Code Ann. § 22-6-201(a) (Repl. 2004).

■ The State argues as its last point that the circuit court erred in allowing Hatchie Coon's lawyer and witness, Scott May, to testify at trial because he served as Hatchie Coon's attorney during this litigation until approximately one month before trial. We need not address the issue of Scott May's testimony as a witness for Hatchie Coon after first serving as its attorney because we reverse on other grounds.

We reverse the order of the circuit court and remand for entry of an order in accordance with this opinion.

Reversed and remanded.

GUNTER and DANIELSON, JJ., dissent.

PAUL E. DANIELSON, Justice, dissenting. Because the major-ity has misconstrued both the facts and the law in this case, resulting in a deprivation of Hatchie Coon's property, I respectfully dissent. The decision relied upon by the majority does indeed make clear that the State can "take," by prescription, lands that it has extended by artificial means. *See State ex rel. Thompson v. Parker*, 132 Ark. 316, 200 S.W. 1014 (1917). However, the State's action must be taken without the consent of the landowner. *See id.* at 321-22, 200 S.W. at 1016 ("When the waters of natural navigable lakes in this state are extended by artificial means, so as to cause the land of riparian owners to be flooded, without their consent, and this condition is not merely temporary, but is continued for a sufficient length of time for the standing waters to produce a distinctive new high-water mark for the waters of the lake bed, this gives the state, as the owner of such lake bed, the possession of the lands so covered to the high-water mark."). This is clearly so because possession of lands with permission renders a claim of adverse possession without merit. *See, e.g., Dotson v. Aldridge*, 246 Ark. 456, 438 S.W.2d 464 (1969). *See also* 3 Am. Jur. 2d *Adverse Possession* § 47 (2008) (observing that adverse possession cannot be permissive and permissive possession is not adverse).

The issue in the instant case, as the majority correctly states, is whether Hatchie Coon consented to the State's flooding of its property. The majority concludes that express consent to the flooding was required, but was not present; I disagree. A review of the record reveals multiple letters between members of Hatchie Coon and the Arkansas Game and Fish Commission. In those letters, Hatchie Coon was clearly requesting a raise in the water levels in the area, which clearly included Hatchie Coon's property.

These requests evidence Hatchie Coon's knowledge that its property would be affected by any flooding and its consent to the Commission's actions.[1] Hatchie Coon specifically welcomed the interest of the Commission in the area, and Hatchie Coon specifically offered its assistance to the Commission in its efforts. How much more specificity is required to demonstrate consent to the Commission's efforts?

The doctrine of adverse possession presupposes that the holding must be adverse to the owner. We have observed that if the original use and possession was permissive, it cannot become adverse until notice of the hostility of the possessor's holding has been brought home to the owner by actual notice or by a holding so open and notorious as to raise a presumption of notice, equivalent to actual notice. *See Mikel v. Development Co., Inc.,* 269 Ark. 365, 602 S.W.2d 630 (1980). Moreover, the evidence of the adverse holding when the original entry is by permission must be very clear. *See id.*

Here, the majority adopts the reasoning of our court of appeals in *White River Levee Dist. v. Reidhar,* 76 Ark. App. 225, 61 S.W.3d 235 (2001), and holds that the "circuit court clearly erred in finding that Hatchie Coon consented, either expressly or implicitly, to the inundation of the island." The problem is that the *Reidhar* case did not involve near the level of consent that we have in the instant case. There, the Levee District admitted that there was no evidence that it gave the appellees, who were found to have adversely possessed the property at issue, "express permission to clear and cultivate the land in dispute." 76 Ark. App. at 229, 61 S.W.3d at 238. Instead, the Levee District merely argued that "the mere existence of a benefit accruing to the District" by the appellees' and their predecessors' occupation "implied the existence of permission." *Id.* at 229-30, 61 S.W.3d at 238. That is clearly distinguishable from the situation here, where members of Hatchie Coon clearly approved of, encouraged, and offered their assistance to, the Commission's efforts to flood the area.

It is clear to me that the Commission's efforts in the area, which included Hatchie Coon's property, were in no way adverse to Hatchie Coon. Not only were the State's actions not adverse,

---

[1] Indeed, the majority opinion acknowledges that the flooding by the Arkansas Game and Fish Commission was at the request of Hatchie Coon members and the St. Francis Lake Association.

Hatchie Coon permitted the State's activities and, thereby, consented to them. For these reasons, the majority errs in its conclusion that the State acquired title to the property at issue by adverse possession, and I respectfully dissent.

GUNTER, J., joins.